Adelaida TORRES–LOPEZ; Guadalupe Montez–Torres; Maria Montez–Torres; Ramon Montez–Torres; Juan Arias–Ayala; Moises Cristobal–Hernandez; Sabino Estrada–Olvera; Rosario Gil–Armenta; Alberto Hernandez–Chavez; Heriberto Hernandez–Perez; Baltazar Pizano–Cadeza; J. Jesus Sanchez–Castaneda; Guillermo Urias–Bero, Plaintiffs–Appellants,

v.

Robert MAY; Bear Creek Farms, a partnership; Tee Pee Farms, Inc.; GCP Farms, Inc.; May Farms, Inc., Defendants–Appellees.

No. 96–35209.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 8, 1997.

Decided April 9, 1997.

Michael Dale, Oregon Legal Services Corporation, James A. Boon, Oregon Law Center, Inc., Portland, OR, for plaintiffs-appellants.

Arthur E. Schmidt, Oregon Legal Services Corporation, Portland, OR, for Adelaida Torres–Lopez and Sabino Estrada–Olvera.

Paul R.J. Connolly, Donaldson, Albert, Tweet, Connolly, Hanna & Muniz, Salem, OR, attorneys for defendants-appellees.

Mary J. Rieser, United States Department of Labor, Washington, D.C., for amicus, United States Secretary of Labor.

Bruce Goldstein, Farmworker Justice Fund, Inc., Washington, D.C., for amici, George Miller, William D. Ford, and Howard L. Berman.

John J. Rademacher, American Farm Bureau Federation, Park Ridge, IL, for amici, Farm Bureau Federations.

Rebecca A. Smith, Columbia Legal Services, Olympia, WA; William G. Hoerger, California Rural Legal Assistance, San Francisco, CA; Michael McCarthy, Davies, Roberts & Reid, Seattle, WA, for amici curiae Juan Herrejon, Mauro Madrid, Abel Garcia Lara and the United Farmworkers of America, Washington State Region.

Before: ALDISERT,[*] PREGERSON, and THOMAS, Circuit Judges.

[*] Honorable Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

PREGERSON, Circuit Judge:

In their second amended complaint ("complaint"), appellant farmworkers allege that appellees (collectively, "Bear Creek Farms")[1] violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219; the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. §§ 1801–1872; and Oregon labor laws.

The alleged violations include the failure to pay the farmworkers the minimum wage required by state and federal law, and numerous statutory violations of record-keeping, reporting, safety, insurance, and registration requirements. The parties do not dispute that these violations occurred. Their only dispute concerns whether Bear Creek Farms was liable for the alleged violations as a "joint employer" of the farmworkers within the meaning of the FLSA, AWPA, and Oregon labor laws.

On cross-motions for summary judgment, the district court concluded that Bear Creek Farms was not a joint employer of the farmworkers within the meaning of the FLSA and AWPA. In arriving at this conclusion, the district court considered the five regulatory factors set forth in 29 C.F.R. § 500.20(h)(4)(ii). These regulatory factors relate to whether an alleged joint employer exerts control over workers and their wages. The district court also considered non-regulatory factors applied in judicial interpretations of the FLSA found in federal case law. These non-regulatory factors relate to whether a farmworker is economically dependent on the alleged joint employer. The district court therefore granted summary judgment on the FLSA and AWPA claims, ruling that Bear Creek Farms was not a joint employer of the farmworkers.

Holding that the FLSA and AWPA standards for joint employment may be used to define joint employment under Oregon law as well, the district court also granted summary judgment to Bear Creek Farms on the Oregon labor law claims. These state law claims have not been fully addressed by the

1. For purposes of this opinion, the term "Bear Creek Farms" includes Robert May; Bear Creek Farms, a partnership; May Farms, Inc.; Tee Pee Farms, Inc.; and GCP Farms, Inc.

parties on appeal. Moreover, the district court's grant of summary judgment relies largely on the district court's interpretation of the FLSA and AWPA standards for joint employment. Accordingly, we decline to address the Oregon law claims. We instead focus on the district court's analysis of the FLSA and AWPA.

We disagree with the district court's conclusion that Bear Creek Farms was not a joint employer of the farmworkers for purposes of the FLSA and AWPA. After considering both the regulatory and non-regulatory factors, we conclude as a matter of law that Bear Creek Farms is a joint employer of the farmworkers.

## BACKGROUND

In 1992, Bear Creek Farms leased land to grow cucumbers to sell to a cannery. Robert May, a Bear Creek Farms official, had primary responsibility for the cucumber crop.

May entered into an oral contract with Jaime Rodriguez of Ag–Labor Services ("Ag–Labor"), a farm labor contractor.[2] Ag–Labor agreed to supply and supervise farmworkers to harvest Bear Creek Farms' cucumber crop. In exchange, Bear Creek Farms agreed to pay Ag–Labor fifty percent of the gross proceeds from the sale of the cucumber crop to the cannery. This oral agreement was standard for the industry.

According to Rodriguez's affidavit, the oral contract provided that Bear Creek Farms had sole responsibility for furnishing the bins where the cucumbers were dumped for transportation to the cannery and for "all business tasks after the bins were filled," namely, unloading the bins onto Bear Creek Farms' trucks, transporting the cucumbers to the cannery, collecting the payments from the cannery, and paying Ag–Labors' fifty-percent share of the proceeds. Bear Creek Farms also maintained toilet facilities for the workers.

Rodriguez stated on the other hand that Ag–Labor was responsible for the harvesting tasks and related activities occurring prior to unloading the bins onto Bear Creek Farms' trucks.[3]

At oral argument we learned that Ag–Labor did not actually recruit farmworkers to work at Bear Creek Farms. We also learned that the farmworkers did not form teams of harvesters that moved from farm to farm picking crops. Rather, individual farmworkers would learn by word of mouth that harvesting work was available at Bear Creek Farms. Hoping to be hired, the farmworkers would appear at the field on harvest days. Ag–Labor would then choose farmworkers from this group.

Ag–Labor harvested Bear Creek Farms' cucumber crop for thirty-seven days between July 13 and September 23, 1992. After completing the cucumber harvest, Bear Creek Farms paid Ag–Labor fifty percent of the proceeds from the sale of the cucumbers to the cannery. Ag–Labor, in turn, paid the farmworkers on a piece-rate basis. The rate which Ag–Labor paid to the farmworkers varied according to the grade of the cucumbers.

---

2. The farmworkers did not name Rodriguez or Ag–Labor as defendants in their action.

3. Rodriguez also stated in his affidavit that Ag–Labor had sole responsibility for the following tasks:
 a. Recruiting workers,
 b. Complying with the AWPA and State of Oregon disclosure requirements,
 c. Arranging for a specific number of workers to be on site,
 d. Arranging for which days to harvest,
 e. Selecting which rows to harvest,
 f. Selecting workers to work specific rows,
 g. Supervising the workers' picking routines, speed of picking, picking quality, and picking schedules,
 h. Filling up the bins,
 i. Hiring the workers,
 j. Firing the workers,
 k. Ensuring working conditions met state and federal law,
 l. The use of piece rate for workers,
 m. The amount to pay workers,
 n. When to pay workers,
 o. The rate of pay for workers,
 p. The withholding of SSI and taxes,
 q. The preparation and retention of payroll records,
 r. The issuance of W–2s,
 s. The payment of payroll taxes, [and]
 t. The preparation and retention of picking records for the workers to determine minimum wage.

During the first picking of the cucumbers, May and Rodriguez discussed ways to increase the percentage of payment to Ag–Labor so that it could pay the farmworkers more money. One reason for paying the farmworkers more during the initial days of the harvest was that their work was more difficult. In accordance with industry practice, they had to "train" the cucumber vines to stay in the same row. This resulted in lower wages for the farmworkers who were paid according to the weight of the cucumbers picked. Ultimately, Bear Creek Farms agreed to pay Ag–Labor more money during this period.

Rodriguez consulted with May in deciding when to have the farmworkers start harvesting the cucumbers. Bear Creek Farms staggered the planting dates to prevent cucumber deliveries from flooding the cannery and to ensure that a large number of farmworkers would not be needed at any given time for harvesting. May would sometimes modify the harvest schedule because of changing conditions. For example, he once told Rodriguez to delay the harvest because of a shortage of bins.

Under the oral agreement, the parties implicitly understood that May had the right to inspect the plants and tell an Ag–Labor supervisor when a row needed to be picked again. May monitored the condition of the cucumber field. For example, May was regularly in the field when the cucumbers were being picked. May would also look over the cucumber plants to see that the vines were properly trained. During the course of the 1992 harvest, Rodriguez communicated with May three or four times a week to ensure May's satisfaction with the farmworkers.

## DISCUSSION

### A. Standard of Review .

■ Whether an entity is a "joint employer" under the FLSA and AWPA is a question of law. *Bonnette v. California Health & Welfare Agency,* 704 F.2d 1465, 1469 (9th Cir.1983); *Antenor v. D & S Farms,* 88 F.3d 925, 929 (11th Cir.1996). We review questions of law de novo. *United States v. Michael R.,* 90 F.3d 340, 343 (9th Cir.1996).

### B. Analysis

#### 1. Farmworker protections under the FLSA, FLCRA, and AWPA

Congress passed the FLSA in 1938 to correct and eliminate those "conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). The FLSA established a minimum wage; regulations concerning "maximum hours"; recordkeeping and reporting requirements; child labor provisions; and a system of civil and criminal penalties for violations of the FLSA. *See generally id.* §§ 201–219. Although the FLSA as adopted in 1938 excluded agricultural workers from its minimum wage protection, Congress amended the FLSA in 1966 to extend minimum wage protection to some agricultural workers. *See* S.Rep. No. 89–1487 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3002 (discussing how the 1966 amendment would extend minimum wage protection to 390,000 agricultural workers).

The FLSA broadly defines the "employer-employee relationship[s]" subject to its reach. *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 728, 67 S.Ct. 1473, 1475, 91 L.Ed. 1772 (1947). " 'Employ' includes to suffer or permit to work." 29 U.S.C. § 203(g). " 'Employer' includes any person acting directly or indirectly in the interest of an employer...." *Id.* § 203(d). The FLSA's definition of employee has been called the " 'broadest definition that has ever been included in any one act.' " *United States v. Rosenwasser,* 323 U.S. 360, 363 n. 3, 65 S.Ct. 295, 296 n. 3, 89 L.Ed. 301 (1945) (quoting 81 Cong.Rec. 7,657 (1938) (statement of Sen. Black)).

Regulations promulgated under the FLSA recognized that an employee may have more than one employer under the FLSA. 29 C.F.R. § 791.2(a) ("A single individual may stand in the relation of an employee to two or more employers at the same time...."). When more than one entity is an employer for purposes of the FLSA, the entities are termed "joint employers." *Id.*

The FLSA, however, did not adequately address the specific problems faced by farm-

workers. In 1963, Congress passed the Farm Labor Contractor Registration Act ("FLCRA"), Pub.L. No. 88–582, 78 Stat. 920 (1963), in an attempt to alleviate the widespread suffering of farmworkers by regulating farm labor contractors. Farm labor contractors are individuals or entities that provide agricultural workers to employers. By 1974, Congress recognized that the FLCRA's focus on regulating farm labor contractors had failed to achieve the desired protections for farmworkers. As made clear in the Committee on Labor and Public Welfare's Report on the FLCRA, "[n]oncompliance by those whose activities the [FLCRA] were intended to regulate has become the rule rather than the exception.... It is quite evident that the [FLCRA] in its present form provides no real deterrent to violations." S.Rep. No. 93–1206, at 3 (1974). Accordingly, Congress amended the FLCRA in 1974 to create a private cause of action for farmworkers and to broaden the definition of "farm labor contractor" to include growers in certain circumstances. Pub.L. No. 93–518, 88 Stat. 1652 (1974).

The 1974 FLCRA amendment also proved ineffective. *See* H.R.Rep. No. 97–885, 97th Cong.2nd Sess. at 2–3 (1982) U.S.Code Cong. & Admin.News pp. 4547, 4548 (noting FLCRA's continuing failure to "reverse the historical pattern of abuse and exploitation of migrant and seasonal farm workers"). In 1982, Congress repealed the FLCRA and replaced it with the AWPA. While the AWPA is similar to the FLCRA, it is different in one critical respect: "The AWPA corrects the key weakness of the FLCRA, which held only the farm labor contractor responsible for such abuses and shielded the employer unless he fell within the narrow definition of 'farm labor contractor' under the [FLCRA]." 128 Cong.Rec. 32,883 (1982) (Statement of Rep. Ford).

The legislative history of the AWPA makes it clear that Congress intended to have growers ensure compliance with the AWPA. "Agricultural employers ... will for the first time be sure of their duties to migrant workers. Agricultural employees will in turn, know who is responsible for their protections, by fixing responsibility on those who ultimately benefit from their labors—the agricultural employer." 128 Cong.Rec. 26,008 (1982) (Statement of Rep. Miller).

### 2. Defining joint employment under the FLSA and AWPA

Under the AWPA, the term "agricultural employer" means "any person who owns or operates a farm, ranch, processing establishment, cannery, gin, packing shed or nursery, or who produces or conditions seed, and who either recruits, solicits, hires, *employs*, furnishes, or transports any migrant or seasonal agricultural worker." 29 U.S.C. § 1802(2) (emphasis added). The term "employ" has the same meaning under the AWPA as under the FLSA. *Id.* § 1802(5). The term includes "to suffer or permit to work." 29 U.S.C. § 203(g). Furthermore, the regulations implementing the AWPA provide that " '[j]oint employment' under the [FLSA] is 'joint employment' under the [AWPA]." 29 C.F.R. § 500.20(h)(4).

This court has recognized that the concept of joint employment should be defined expansively under the FLSA—and therefore under the AWPA as well. *See Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir.1979) (noting in joint employment case that "[c]ourts have adopted an expansive interpretation of the definitions of 'employer' and 'employee' under the FLSA, in order to effectuate the broad remedial purposes of the Act"). To determine if a joint employment relationship exists, this court has applied an "economic reality" test. *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir.1983); *Real*, 603 F.2d at 754. A court should consider all those factors which are "relevant to [the] particular situation" in evaluating the "economic reality" of an alleged joint employment relationship under the FLSA. *Bonnette*, 704 F.2d at 1470.

The AWPA regulations provide a non-exhaustive list of *regulatory* factors to consider in identifying a joint employment relationship. These five regulatory factors are:

(A) The nature and degree of control of the workers;

(B) The degree of supervision, direct or indirect, of the work;

(C) The power to determine the pay rates or the methods of payment of the workers;

(D) The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; [and]

(E) Preparation of payroll and the payment of wages.

29 C.F.R. § 500.20(h)(4)(ii).

The AWPA regulations expressly state that this list is not exhaustive. *See id.* (instructing that the five regulatory factors provide guidance, but are not the only factors to consider in deciding whether a joint employment relationship exists). The regulations also cite with approval several FLSA cases that define joint employment.[4] In these cases, the courts considered many factors not listed in the AWPA regulations. The "non-regulatory factors" considered by these courts in deciding whether a joint employment relationship existed include:

(1) whether the work was a "specialty job on the production line," *Rutherford,* 331 U.S. at 730, 67 S.Ct. at 1477;

(2) whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without "material changes," *id.;*

(3) whether the "premises and equipment" of the employer are used for the work, *id.; see also Real,* 603 F.2d at 754 (considering the alleged employee's "investment in equipment or materials required for his task, or his employment of helpers");

(4) whether the employees had a "business organization that could or did shift as a unit from one [worksite] to another," *Rutherford,* 331 U.S. at 730, 67 S.Ct. at 1477;

(5) whether the work was "piecework" and not work that required "initiative, judgment or foresight," *id.; see also Real,* 603 F.2d at 754 (considering "whether the service rendered requires a special skill");

(6) whether the employee had an "opportunity for profit or loss depending upon [the alleged employee's] managerial skill," *Real,* 603 F.2d at 754;

(7) whether there was "permanence [in] the working relationship," *id.;* and

(8) whether "the service rendered is an integral part of the alleged employer's business," *id.*

In the instant case, the district court relied heavily on the five regulatory factors listed in 29 C.F.R. § 500.20(h)(4)(ii). The district court ruled that most of the non-regulatory factors were not helpful because "those factors simply reflect the fact and nature of [Bear Creek Farms'] business and/or indicate that plaintiffs had an employment relationship with someone, without indicating with whom that relationship existed." *Torres–Lopez v. May,* No. 94–851 ST, slip op. at 37 (D.Or. Oct. 17, 1995) ("District Court Opinion").[5]

 To the contrary, the non-regulatory factors play an important role in revealing the economic reality of the farmworkers' alleged employment relationship with Bear Creek Farms. For example, a grower's ownership of farmland is relevant "for the obvious reason that without the land, the worker might not have work, and because a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors." *Antenor,* 88 F.3d at 937 (citing *Gulf King Shrimp Co. v. Wirtz,* 407 F.2d 508, 513–14 (5th Cir.1969)). Similarly, the grower's investment in "equip-

**4.** The regulations cite to *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); *United States v. Rosenwasser,* 323 U.S. 360, 65 S.Ct. 295, 89 L.Ed. 301 (1945); *Real v. Driscoll Strawberry Assocs., Inc.,* 603 F.2d 748 (9th Cir.1979); *Usery v. Pilgrim Equip. Company, Inc.,* 527 F.2d 1308 (5th Cir.), *cert. denied,* 429 U.S. 826, 97 S.Ct. 82, 50 L.Ed.2d 89 (1976); *Mednick v. Albert Enters., Inc.,* 508 F.2d 297 (5th Cir.1975); *Hodgson v. Okada,* 472 F.2d 965 (10th Cir.1973); *Hodgson v. Griffin & Brand of McAllen, Inc.,* 471 F.2d 235 (5th Cir.), *cert. denied,* 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973); and *Mitchell v. Hertzke,* 234 F.2d 183 (10th Cir.1956).

**5.** Magistrate Judge Janice M. Stewart filed the "Opinion, Findings and Recommendations" which the district court adopted in its entirety in granting summary judgment to Bear Creek Farms. For purposes of this opinion, we will refer to the "Opinion, Findings, and Recommendations" as the "District Court Opinion."

ment and facilities" is probative of the "workers' economic dependence on the person who supplies the equipment or facilities." *Id.* Finally, considering whether the farmworkers perform "a line-job integral to [the grower's] business" is relevant "because a worker who performs a routine task that is a normal and integral phase of the grower's production is likely to be dependent on the grower's overall production process." *Id.* (citing *Rutherford,* 331 U.S. at 730, 67 S.Ct. at 1477).

In emphasizing the regulatory factors, the district court followed *Aimable v. Long & Scott Farms,* 20 F.3d 434 (11th Cir.1994) (involving farmworkers' FLSA and AWPA claims against farm labor contractor and grower). *Aimable* is not persuasive authority, however, because it misconstrued the importance of the non-regulatory factors. For example, *Aimable* excluded the non-regulatory factor of "investment in equipment and facilities" from its analysis of an alleged employment relationship because use of that factor did not show whether the farmworkers were *more* dependent on the grower or the farm labor contractor. *Id.* at 443.

▆▆▆ In so concluding, the *Aimable* court ignored a fundamental principle behind the joint employment doctrine: that a worker may be employed by more than one entity at the same time. *See* 29 C.F.R. §§ 500.20(h)(4)(i); *Bonnette,* 704 F.2d at 1469. The issue is not whether a farmworker is *more* dependent upon the farm labor contractor or the grower. Rather, the inquiry must focus on the economic reality of the particular relationship between the farmworker and the alleged joint employer. *See Antenor,* 88 F.3d at 932 ("[T]he question in 'joint employment' cases is not whether the worker is more economically dependent on the independent contractor or the grower, with the winner avoiding responsibility as an employer.").

Another reason why the district court in this case declined to attribute much significance to the non-regulatory factors was the concern that their use would result in few situations where growers would not be deemed a joint employer under the AWPA. District Court Opinion at 30. The district court believed that Congress did not intend this result. *Id.*

The district court misconstrued congressional intent. Congress expressly incorporated the FLSA definition of "employ" into the AWPA. 29 U.S.C. § 1802(5). As already explained, the FLSA definition of employment is broad. Congress presumably knew what it was doing when it chose to borrow this concept from the FLSA. Furthermore, the Department of Labor indicated at oral argument that a proper interpretation of the AWPA would result in many instances where growers would be liable for violations of the AWPA.[6]

---

6. At oral argument, counsel for the Department of Labor expressed the Department's view that many courts had been overly restrictive in defining the concept of "joint employer" by emphasizing the regulatory factors found in 29 C.F.R. § 500.20(h)(4)(ii). Those factors concern the degree of control a putative employer has over an employee.

The Department of Labor has issued new regulations, effective April 11, 1997, to remedy this misconception. The new regulations read in part as follows:
> The current [AWPA] "joint employment" regulation identifies particular factors which should be considered in determining the existence of such [joint employment] relationships in the agricultural context. This Departmental guidance appears to be subject to some misunderstanding in the regulated community and the courts with regard to the applicability of the legal standards under [the AWPA] and the Fair Labor Standards Act, which contain the identical statutory standard. It is the Department's view that the [AWPA] "joint employment" regulation will be strengthened by focusing more closely on the ultimate test for employment and joint employment as established by the federal courts, i.e., "economic dependence," and by further clarifying the multi factor analysis to be used to determine the existence of "economic dependence" in the agricultural context.

> . . . . . . . . . . . . . . .

> . . . The factors identified in the regulation were not intended by the Department to be a checklist for determining a joint employment relationship; nor were the factors intended to be given greater weight than other relevant factors presented in a particular case or developed in the case law. To the extent that courts and the regulated community may have strayed from the "economic reality"/"economic dependence" analysis—by applying the regulation as a rigid checklist, or treating the

### 3. Applying the joint employment test to Bear Creek Farms

#### a. The regulatory factors

The district court divided the regulatory factors into two groups. The first group of regulatory factors relates to control of the workers and working conditions: the nature and degree of control of the workers; the degree of supervision, direct or indirect, of the work; and the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers. After considering the factors in this first group, the district court concluded that Bear Creek Farms did not exercise enough control to qualify as a joint employer of the farmworkers. The district court stated:

> At best, the evidence indicates that [Bear Creek Farms] may have had the right to indirectly, and only to a limited extent, supervise [the farmworkers'] work.... There is no evidence that Bear Creek Farms had the right to do anything other than pass its concerns on to an Ag–Labor supervisor. Presumably, the Ag–Labor supervisor would then decide what, if any, action needed [to be] taken. [Bear Creek Farms'] supervision was *de minimis* at best.
>
> Similarly, there is no evidence that Bear Creek Farms had the right to hire or fire [the farmworkers], determine how many would pick on a given day, determine the day(s) and hour(s) they would pick, what rows would be picked and by whom, or require any specific picking routine, speed, or quality. It only gave general instructions to Ag–Labor as to when to begin harvesting and what fields to harvest.
>
> Even if defendants enjoyed some limited right to control [the farmworkers] or supervise their work, there is no evidence that defendants exercised such a right.... May, who had primary responsibility for the cucumber crop, occasionally checked

on how the field was holding up and how the vines were being trained. However, he never had any reason to talk to Ag–Labor's employees and/or supervisors because he never developed any particular concerns about the way the harvest was being handled. The record supports the conclusion that Ag–Labor and its employees were responsible for performing a discrete task, *to wit*, taking cucumbers off the vines and placing them in the crates.

District Court Opinion at 35–36.

■ The district court did not adequately consider the evidence in applying the regulatory factors in this first group. The record reveals that Bear Creek Farms in fact exercised significant control over the farmworkers' working conditions.

First, Bear Creek Farms controlled the overall harvest schedule and the number of workers needed for harvesting by staggering the planting dates of the cucumbers. Bear Creek Farms also advised Ag–Labor about when to begin the harvest. Bear Creek Farms had the power to decide which days were suitable for harvesting; for example, it called off the harvest one day because of a shortage of bins.

Second, Bear Creek Farms also exercised a substantial degree of supervision over the work performed by the farmworkers. May had the right to inspect all the work performed by the farmworkers, both while it was being done and after the cucumbers were picked. His daily presence in the fields helped to ensure that the farmworkers performed satisfactorily. Ag–Labor, through Rodriguez, also communicated three to four times a week with May to ensure that May was satisfied.

■ The district court did not attribute much significance to the above facts because it concluded that any control exercised by Bear Creek Farms was exercised indirectly. The regulations expressly state, however,

regulation as an exclusive list which precludes consideration of additional factors (e.g., whether workers' activities are an integral part of the putative employer's operation), or distorting or placing undue emphasis on particular factors (e.g., "control" misconstrued as being direct supervision of workers' activities)—the regula-

tion is not only being misinterpreted but is also being applied so as to frustrate the express intention of Congress in enacting [the AWPA]. Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed.Reg. 11734, 11745–46 (1997) (footnote omitted) (to be codified at 29 C.F.R. pt. 500).

that indirect control as well as direct control can demonstrate a joint employment relationship. 29 C.F.R. § 500.20(h)(4)(ii) (listing one of the regulatory factors as "[t]he degree of supervision, *direct or indirect*, of the work") (emphasis added); *see also Hodgson v. Griffin & Brand of McAllen, Inc.*, 471 F.2d 235, 238 (5th Cir.1973) ("The fact that [the grower] effected the supervision by speaking to the crew leaders, who in turn spoke to the harvest workers, rather than speaking directly to the harvest workers does not negate a degree of apparent on-the-job control over the harvest workers.").[7]

The second group of regulatory factors considered by the district court relates to control of payment and the payroll: the power to determine the pay rates or the methods of payment of the workers and the preparation of payroll and the actual payment of wages. The district court ruled as follows:

> The remaining regulatory factors require an examination of defendants' power to determine plaintiffs' pay rates and/or method of payment and whether defendants prepared payroll and paid wages. There is no evidence that anyone, other than ... Ag–Labor, paid [the farmworkers] for the cucumbers they picked.... [T]he undisputed evidence confirms that Bear Creek Farms was required to pay to Ag–Labor half of the proceeds that Bear Creek Farms received for the cucumbers from the cannery. If Bear Creek Farms had paid more money, Ag–Labor was free to retain the increase rather than raise [the farmworkers'] wages. There is no evidence that Bear Creek Farms had any influence over Ag–Labor in this regard.
>
> Both May and Rodriguez testified that, under the 1992 harvesting contract, Ag–Labor would pick the cucumbers ... in exchange for half of the proceeds.... There is some evidence that the actual percentage paid over the course of the harvest varied from time to time, as well as some dispute over the reasons for the fluctuating percentages. However, it is undisputed that the total amount paid to Ag–Labor by Bear Creek Farms for the

1992 cucumber harvest was exactly 50% of the total amount received by Bear Creek Farms from the cannery for the cucumbers.

District Court Opinion at 36–37.

■ It is true that Bear Creek Farms was not involved in preparing the farmworkers' payroll or directly paying their wages. The record does show, however, that Bear Creek Farms exercised some power in determining the pay rates for the farmworkers during the early part of the harvest. It is undisputed that Bear Creek Farms increased Ag–Labor's compensation during the first picking of the cucumbers in order to allow the farmworkers to draw higher wages.

b. *Non-regulatory factors*

■ All but one of the eight non-regulatory factors that we identified in Part B.2 point to a conclusion that the farmworkers were employees of Bear Creek Farms for purposes of the FLSA and AWPA. First, the farmworkers' task of picking cucumbers is analogous to a "specialty job on the production line," *Rutherford,* 331 U.S. at 730, 67 S.Ct. at 1477. The farmworkers' only function was to pick cucumbers according to standard industry practice. What they did constituted one small step in the sequence of steps taken by Bear Creek Farms to grow the cucumbers and prepare them for processing at the cannery.

■ Second, there were no "material changes," *id.,* in the terms of the oral contracts between Bear Creek Farms and farm labor contractors such as Ag–Labor. The contracts were standard for the industry and involved little negotiation.

■ Third, Bear Creek Farms had an ownership interest in the "premises and equipment," *id.,* used for the work. Bear Creek Farms leased the land where the cucumbers were grown. Neither Ag–Labor nor the farmworkers had any ownership interest in the land. Bear Creek Farms also made a considerable "investment in equipment and materials," *Real,* 603 F.2d at 754,

---

**7.** Although *Hodgson* is an out-of-circuit case, it is persuasive authority because the federal regulations implementing the AWPA cite to it. 29 C.F.R. § 500.20(h)(4)(ii).

for purposes of raising, harvesting, and delivering the cucumbers to the cannery. Bear Creek farms paid for the costs of planting, weeding, irrigating, fertilizing, and spraying pesticides. In addition, Bear Creek Farms paid for the costs of transporting the cucumbers from the fields to the cannery, in trucks owned by Bear Creek Farms. By contrast, the workers provided only simple, hand-held tools.

Fourth, the farmworkers did not have a "business organization that could or did shift as a unit from one [farm] to another," *Rutherford*, 331 U.S. at 730, 67 S.Ct. at 1477. Rather, individual farmworkers, would learn by word of mouth that the cucumbers were ready for picking and find their own way to the cucumber field. Ag–Labor then selected the farmworkers from the labor pool that showed up.

Fifth, the job of picking cucumbers is "piecework" that requires no great "initiative, judgment, or foresight," *id.*, or "special skill," *Real*, 603 F.2d at 754.

Sixth, the farmworkers had no "opportunity for profit or loss depending upon [their] managerial skill," *Real*, 603 F.2d at 754. They worked at a piece-rate and the amount of money they earned depended solely upon the number of cucumbers they themselves picked.

Seventh, there was no "permanence of the working relationship," *id.*, because the farmworkers only harvested for Bear Creek Farms for thirty-two days in 1992. This is the only non-regulatory factor that we have identified that does not support a conclusion that an employment relationship existed between the farmworkers and Bear Creek Farms.

Eighth, it is beyond dispute that the collective effort of the workers in harvesting the cucumber crop was an "integral part of [Bear Creek Farms'] business," *id.* Unless the cucumbers were picked and sent to the cannery, Bear Creek Farms would not have been able to realize any of the economic benefits from its substantial investment in growing the cucumbers.

Our consideration of the regulatory and non-regulatory factors leads us to conclude that Bear Creek Farms exercised control over the farmworkers and that the farmworkers were economically dependent on Bear Creek Farms. Therefore, we conclude as a matter of law that Bear Creek Farms was a joint employer of the farmworkers for purposes of the FLSA and AWPA.

## C. *Oregon Law Claims*

The farmworkers also allege violations of the Oregon minimum wage law, Or.Rev.Stat. § 653.010–.300, and Oregon law concerning the payment of wages, Or.Rev.Stat. § 652.110–.250. The district court concluded that the definition of the term "employ" for the Oregon labor laws in question "is the same as under the FLSA and 'includes to suffer or permit to work.'" District Court Opinion at 41. The district court reasoned that "federal regulations and case law interpreting the meaning of 'employ' under the FLSA are persuasive authority when considering whether an employment relationship exists for purposes of ORS Chapters 652 and 653." *Id.* at 41–42 (citing *Northwest Advancement v. Bureau of Labor*, 96 Or.App. 133, 772 P.2d 934, 937, *rev. denied*, 308 Or. 315, 779 P.2d 618 (Or.1989), *cert. denied*, 495 U.S. 932, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990)).

The district court held that because no joint employment relationship existed under the FLSA or AWPA, the farmworkers could not state a claim under Oregon law. Because we conclude that the district court erred in holding that no joint employment relationship existed between the farmworkers and Bear Creek Farms for purposes of the FLSA and AWPA, the district court's grant of summary judgment on the Oregon law claims cannot be affirmed on that basis.

The parties did not adequately brief the issue whether Bear Creek Farms is entitled to summary judgment on the Oregon law claims. We therefore vacate the district court's grant of summary judgment on the Oregon law claims and remand to the district court to resolve the issue of the proper interpretation of Oregon law.

## CONCLUSION

We reverse the district court's grant of summary judgment to Bear Creek Farms on the farmworkers' claims under the FLSA and the AWPA. We rule as a matter of law that Bear Creek Farms is a joint employer of the farmworkers for purposes of the FLSA and the AWPA. We vacate the district court's grant of summary judgment to Bear Creek Farms on the farmworkers' claims under Oregon law. We remand for further proceedings consistent with this opinion.

Reversed, vacated, and remanded.

ALDISERT, Circuit Judge, Dissenting.

In the grand scheme of jurisprudence, this is not a difficult case of divining esoteric law or interpreting enigmatic statutes or regulations. This case involves a rather simple matter of applying undisputed facts to a number of factors derived from case law and Department of Labor regulations, in order to determine whether a cucumber grower is a joint employer of laborers hired to pick cucumbers, or whether the laborers are employees only of the labor contractor that hired them. Our role as appellate judges is to decide a basic type of adjudicatory conflict in which, as described by Cardozo, "the rule of law is certain and the application [to the facts] alone doubtful." [1]

To be sure, we may determine whether a given fact comes within the letter or spirit of each regulatory or non-regulatory factor by examining "logically determinable or empirically observable facts." [2] In this respect, we must ensure logical soundness by vigorous fealty to concepts of analogy. Analogy is the quintessential method of comparison in which we carefully examine the quality of positive and negative resemblances in the facts and apply these resemblances to the controlling standard. Only when it is impossible to use the logical method of analogy should resort be made to personal "value judgments which

are derived from practical standards or ... views" [3]; "what Holmes called his 'can't helps', his ultimate convictions or values." [4]

In my approach to this case I will use only the logical process of analogy. A proper analogy should identify the number of respects in which the compared fact scenarios resemble one another (let us call these resemblances positive analogies) and the number of respects in which they differ (negative analogies). In analogy, unlike the method of inductive enumeration, the quantity of cases is not significant. Instead, what is important is *relevancy*—whether the compared facts resemble or differ from one another in relevant respects. John Stuart Mill asked the question: "Why is a single instance, in some cases, sufficient for a complete induction, while in others myriads of concurring instances, without a single exception known or presumed, go such a very little way towards establishing an universal proposition? Whoever can answer this question knows more of the philosophy of logic than the wisest of the ancients, and has solved the problem of Induction." [5]

### I.

First, some legal precepts about which there can be no controversy. I draw these from the Department of Labor's explanatory comments to the rules and regulations to be effective April 11, 1997, as referenced in the majority opinion at note 6.

● The Department has very specifically avoided creating "strict liability," and has refused to adopt any regulatory test that would presume a joint employment relationship in every instance where an agricultural employer/association retains the services of a FLC (farm labor contractor).

● Where the grower not only specifies in the contract the size or ripeness of the produce to be harvested, but also appears in the field to check on the details of the

1. Benjamin N. Cardozo, *The Nature of the Judicial Process* 164 (1921).

2. Max Weber, *Value Judgments in Social Science*, reprinted in *Weber Selections* 69 (W.G. Runciman, ed. 1987).

3. *Id.*

4. Paul Freund, *Social Justice and the Law*, in *Social Justice* 93, 110 (R. Brandt ed. 1962).

5. John Stuart Mill, *A System of Logic Ratiocinative and Inductive* 206 (8th ed. 1916).

work and communicates to the FLC any deficiencies observed, the circumstances must be closely examined to determine if the· grower is demonstrating sufficient indirect control of the workers to indicate there may be·a joint employment relationship. (To be sure, then, the converse must be true: if the grower does not communicate any deficiencies to the FLC, this instruction is not applicable.)

● The Department has revised its regulations to adopt the factors previously appearing in case law (the non-regulatory factors). These factors are the principal subject of discussion in the majority opinion and in the considerations that follow.[6]

## II.

Before discussing the regulatory and non-regulatory factors, it is useful to summarize each set of factors. The Labor Department's regulations implementing the Migrant and Seasonal Agricultural Workers Protection Act (AWPA) list five factors to consider in determining whether an entity or person is a joint employer:

(A) The nature and degree of control of the workers;

(B) The degree of supervision, direct or indirect, of the work;

(C) The power to determine the pay rates or the methods of payment of the workers;

(D) The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; [and]

(E) Preparation of payroll and payment of wages.

29 C.F.R. § 500.20(h)(4)(ii).

The AWPA regulations make clear that this list is not exhaustive. *See id.* (instructing that the five regulatory factors provide guidance, but the factors to be considered in deciding whether a joint employment relationship exists are not limited to the five regulatory factors).

To determine whether a joint employment relationship exists, this court has applied an "economic reality" test. *Bonnette v. California Health and Welfare Agency,* 704 F.2d 1465 (9th Cir.1983). In evaluating the economic realities of a given relationship, a court should consider all factors relevant to the particular situation. *Id.* Thus, courts look not only to factors provided in the regulations, but also to the following factors developed through case law:

(1) The degree of the alleged employer's right to control the manner in which the work is to be performed;

(2) The alleged employee's opportunity for profit or loss depending upon the alleged employee's managerial skill;

(3) The alleged employee's investment in equipment or materials required for the alleged employee's task, or the employee's employment of helpers;

(4) Whether the service rendered requires a special skill;

(5) The degree of permanence of the working relationship;

(6) Whether the service rendered is an integral part of the alleged employer's business;

(7) Ownership of property or facilities where work occurred; and

(8) Whether responsibility under the contracts between a labor contractor and an employer passes from one labor contractor to another without material changes.

*See Real v. Driscoll Strawberry Assoc., Inc.,* 603 F.2d 748, 754 (9th Cir.1979) (naming the first six non-regulatory factors); *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) (discussing the latter two factors).[7]

## III.

I first address the Labor Department's regulatory factors.

---

**6.** Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed.Reg. 11,734 (1997) (to be codified at 29 C.F.R. pt. 500).

**7.** The majority's wording of the first six non-regulatory factors differs from the formulation set forth by this court in *Real.* To avoid muddying the waters in this area of the law, I will continue to use the language of *Real.* I accept two of the new factors offered by the majority, however, because these factors appear in the Supreme Court's analysis in *Rutherford,* and are not encompassed by the language of *Real.*

## A.

### The nature and degree of control of the workers

Bear Creek controlled the workers to a certain extent because, as the grower, it determined when the harvest would occur. But Bear Creek did not exercise control over any individual Appellants. Bear Creek controlled how many workers would be needed at a given time by staggering the planting dates of the cucumbers. It also determined when to start the harvest, and it sometimes called off the harvest on a particular day because of a shortage of bins. However, Bear Creek did not otherwise determine how many workers would pick on a particular day, or the specific days or hours the workers would pick. It did not specify which workers would do the picking, nor did it require a specific routine or picking speed. Bear Creek gave only general instructions to Ag–Labor as to when to begin harvesting and what fields to harvest. On balance, the negative resemblances regarding control and supervision of the workers outnumber the positive resemblances. *Cf. Antenor v. D & S Farms,* 88 F.3d 925 (11th Cir.1996) (joint employment existed where the growers told the FLC how many workers to bring each day, the growers determined the precise moment when picking would commence and the growers had the ability to assign work to specific workers). Accordingly, this factor suggests that Bear Creek was not the Appellants' joint employer.

## B.

### The degree of supervision, direct or indirect of the work

Bear Creek never exercised any supervision, either direct or indirect, over the Appellants. Bear Creek's representative, Robert May, was present at the cucumber farm regularly—he did most of the driving of the trucks from the fields to the cannery. May testified in his deposition that he might have looked over the vines if he had to go into the field for some other purpose, such as irrigation, but he never had any problems with the Appellants' work and he never complained to anyone from Ag–Labor after he went

through the field. Nor did anyone else from Bear Creek ever walk the fields to check Ag–Labor's work. This factor suggests that Bear Creek was not a joint employer. *Compare Antenor,* 88 F.3d at 935 (joint employment existed where growers supervised the pickers' work by communicating with the workers and their supervisors on a daily basis) *with Aimable v. Long & Scott Farms, Inc.,* 20 F.3d 434, 441 (11th Cir.1994) (no joint employment where grower made only "infrequent assertions of minimal oversight").

## C.

### The power to determine the pay rates or the methods of payment of the workers

There is no evidence that Bear Creek ever paid the Appellants directly. Bear Creek paid Ag–Labor half the proceeds of the harvest, and Ag–Labor was free to pay its workers whatever rate it might choose. There is some evidence that May expressed concern to Ag–Labor that the farm workers be paid at least minimum wage, and that Bear Creek increased Ag–Labor's compensation during the first picking so that the farm workers might be paid more during this period. Apparently, Bear Creek thought the workers would be more likely to "train" the vines properly if they were paid well in the early stages of the harvest. There is no evidence, however, that Bear Creek required Ag–Labor to pay at any particular rate. Ag–Labor had the sole power to determine the pay rates and the methods of payment for the workers. This factor suggests that Bear Creek was not a joint employer.

## D.

### The right, directly or indirectly, to hire, fire or modify the employment conditions of the workers

There is no evidence that Bear Creek had any right to hire or fire workers, or to modify the conditions of their employment. This factor suggests that Bear Creek was not a joint employer.

### E.

### Preparation of payroll and payment of wages

There is no evidence that Bear Creek prepared the Appellants' payroll or paid their wages. This factor suggests that Bear Creek was not a joint employer.

In sum, a dispassionate evaluation of the five Labor Department regulatory factors overwhelmingly indicates that Bear Creek was not a joint employer. All five factors support this conclusion. Clearly, consideration of each factor, as well as the determination of the ultimate question of economic dependency, is a qualitative rather than a quantitative analysis. The factors are not a checklist, and no one factor is dispositive on the ultimate question of joint employment. But in this case, when we apply the undisputed facts to the regulatory factors, the negative resemblances greatly outnumber the positive, and provide a strong indication that Bear Creek was not a joint employer.

### IV.

### Non–Regulatory Factors

Under the rubric of non-regulatory factors, case law has focused on economic reality and economic dependence to determine the presence of joint employers. My review of these factors shows that some factors suggest Bear Creek was a joint employer, some are inconclusive (and in the language of the logicians, do not qualify as either positive or negative resemblances) and some exonerate Bear Creek as a joint employer.

### A.

### The degree of the alleged employer's right to control the manner in which the work is to be performed

There is some indication in the record that Bear Creek had the right to indirectly supervise the farmworkers. Jaime Rodriguez of Ag–Labor testified that, pursuant to Ag–Labor's oral agreement with Bear Creek, the parties implicitly understood Bear Creek had the right to inspect the plants and tell an Ag–Labor supervisor that a row needed to be picked again. There is no evidence, however, that Bear Creek had the right to supervise any other aspect of the harvest, such as the number of workers that would pick at a given time, the hours they would work or the speed at which they would pick.

As discussed above, it is undisputed that Bear Creek did not even exercise the limited right to supervision which it held. Bear Creek provided no supervision, direct or indirect, over the Appellants; May was often present in the fields, but never complained to Ag–Labor about the way the workers were performing the harvest. In light of these facts, I agree with the district court's assessment that Bear Creek's supervision was "de minimis at best."

### B.

### Opportunity for profit or loss depending upon the alleged employee's managerial skill

This is a factor which the district court found not helpful. I agree and place this in the inconclusive category. In general, if a job requires special managerial skills, the person performing the job is more likely to be an independent contractor. Conversely, if the job requires little or no managerial skill, the person is probably an employee. Cucumber picking involves no managerial skills. The fact that Appellants did not need managerial skills merely indicates they were employees rather than independent contractors. It provides no guidance as to who (Bear Creek, Ag–Labor or both) employed them. Other courts have disregarded this factor in similar situations. *See Aimable*, 20 F.3d at 443; *Antenor*, 88 F.3d at 932 n. 9.

### C.

### The alleged employee's investment in equipment or materials required for the alleged employee's task, or the employee's employment of helpers

This is another factor which the district court determined not useful in this case. I agree. As observed by the district court, investment in equipment and materials is useful in situations where workers must use certain equipment or materials to perform

their job. In such cases, if the worker owns the equipment, the worker is probably an independent contractor. Conversely, if the alleged employer owns the equipment, an employer/employee relationship is more likely.

In this case, neither Bear Creek nor the workers had any significant investment in equipment or materials necessary to perform the harvest. The workers placed the cucumbers into buckets, and later into crates, which were owned by the cannery. Where neither party had any significant investment in equipment or materials, this factor is of little help.

This factor deals with the investment in equipment or materials "required for [the employee's] task," *Real,* 603 F.2d at 754, not with the alleged employer's investment in all the equipment used in its business activity. In *Real,* this court considered the alleged employer's overall investment in the business activity, but in that case, unlike the case at bar, the employer's overall investment had a direct relationship to the task performed by the workers. In *Real,* the appellants worked on a strawberry farm. They participated in nearly every stage of the operation: they prepared the land, planted the crop, dusted the crops for mildew, weeded and irrigated the field and picked the berries. *Id.* at 751–52. Accordingly, the court considered all of the equipment used in the farming operation because nearly all of that property was used by the workers themselves. Here, Appellants participated only in the picking of the cucumbers. To the extent Bear Creek's total investment in the farming operation is relevant, it falls under a different factor: "whether the service rendered is an integral part of the alleged employer's business," discussed below.

### D.

### Whether the service rendered requires a special skill

This is another factor which the district court found not helpful. I agree. Like non-regulatory factor "B", discussed above, this factor is useful in distinguishing whether a worker was an employee or an independent contractor. In this case, the task required no special skill. This fact indicates the Appellants were employees, but it does not show they were employees of Bear Creek. As with factor "B," other courts have disregarded this factor in similar situations. *See Aimable,* 20 F.3d at 444; *Antenor,* 88 F.3d at 932 n. 9.

### E.

### The degree of permanence of the working relationship

This factor indicates that Bear Creek was not the Appellants' joint employer. The relationship was brief (32 days) and the workers had the option of working for other growers during that time. Indeed, at oral argument it was disclosed that the workers would arrive at a particular field only after learning by word of mouth that work might be available. This factor is critical because it shows the Appellants were not dependent upon Bear Creek in any meaningful way.

### F.

### Whether the service rendered is an integral part of the alleged employer's business

The district court found this factor was not helpful. I disagree. I think this suggests Bear Creek was the Appellants' joint employer.

The district court stated:

Harvesting of the crop is arguably always an 'integral' part of farming; without a harvest there is no income ... [h]owever, harvesting is a discrete task, easily separated from the task of growing cucumbers. Thus, the nature of the work plaintiffs were performing is of no assistance in determining whether defendants, or only Perez and/or Ag–Labor, employed them.

The court's reasoning here conflicts with Supreme Court and this court's teachings, as well as case law from other circuits. The Supreme Court has found evidence of a joint employment relationship where workers performed a discrete task in a larger production process. *Rutherford,* 331 U.S. at 730, 67 S.Ct. at 1477 ("boners" hired by an indepen-

dent contractor were employees of the slaughterhouse where they worked). Our court and other courts of appeals have applied the same reasoning to agricultural workers. *See, e.g., Real,* 603 F.2d.748; *Antenor,* 88 F.3d at 937.

### G.

### Ownership of property or facilities where work occurred

This factor suggests Bear Creek was a joint employer. Bear Creek leased the property where the cucumbers were harvested. Neither Ag–Labor nor the workers had any ownership interest in the property.

The district court found this factor not helpful in the agricultural context because harvesting always occurs on the property where the crops are located. I believe the district court erred in its application of this factor. It is true that in all cases involving agricultural workers the grower is likely to have the only ownership interest in the property where the work occurs. But this is not a valid reason for disregarding this factor. On the contrary, the ownership of the property is relevant "for the obvious reason that ... a business that owns or controls the work site will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors." *Antenor,* 88 F.3d at 937 (citing *Gulf King Shrimp Co. v. Wirtz,* 407 F.2d 508, 513–14 (5th Cir.1969)).

Although I recognize that this factor provides some indication of joint employment, I am reluctant to overemphasize the importance of owning the facilities. Giving too much weight to this factor could result in a virtual strict liability for growers, a result which the Department of Labor has expressly disavowed. *See* part I, *supra.*

### H.

### Whether responsibility under the contracts between a labor contractor and an employer passes from one labor contractor to another without material changes

This factor suggests Bear Creek was a joint employer. According to Rodriguez's affidavit, there was little negotiation involved in the oral contract between Bear Creek and Ag–Labor, and the 50% split was standard in the cucumber harvesting industry. In *Rutherford,* the Court found that such an arrangement supported a finding of joint employment. *Rutherford,* 331 U.S. at 730, 67 S.Ct. at 1476.

### V.

When all the factors—regulatory and non-regulatory—are weighed, it is evident that Bear Creek was not the Appellants' joint employer. Under the foregoing analysis, three factors indicate Bear Creek was a joint employer and seven factors indicate Bear Creek was not a joint employer. The other three factors are inconclusive. To be sure, the determination cannot be "on the numbers" by the quantity of resemblances; the outcome must depend, as in any analogical analysis, on the relevancy to the totality of circumstances. Here, with our polestar being economic dependence, we must look at the resemblances to determine whether Appellants were economically dependent upon Bear Creek. In light of the facts that Bear Creek did not exercise any meaningful control or supervision over the Appellants, did not hire or fire them, did not control their rate of pay, did not prepare their payroll or pay their wages and did not require their services for any significant amount of time, I conclude that the negative resemblances predominate.

I cannot accept the majority's conclusion that Appellants were economically dependent on Bear Creek. I would affirm the judgment of the district court. Accordingly, I dissent.