Vicente **TORRES**

v.

**AIR TO GROUND SERVICES, INC., et al.**

No. CV 13–03164 SJO (RZx).

United States District Court, C.D. California.

Signed May 9, 2014.

390

Brad S. Kane, John M. Morris, Kane Law Firm, Brett S. Markson, Timothy A. Pico, Markson Pico LLP, Los Angeles, CA, for Vicente Torres.

Nina Huerta, Stephen A. Tuggy, Locke Lord LLP, Los Angeles, CA, Megan E. Hodapp, Locke Lord LLP, Houston, TX, Emily Christin Pera, Jane M. Flynn, Federal Express Corporation, Irvine, CA, Terrence O'Neal Reed, Federal Express Corporation, Memphis, TN, for Air to Ground Services, Inc., et al.

**PROCEEDINGS (in chambers): ORDER GRANTING IN PART DENYING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** [Docket No. 68]

S. JAMES OTERO, District Judge.

This matter is before the Court on Plaintiffs Vicente Torres ("Torres") and Randy Vivar Carino's ("Carino") (together, "Plaintiffs") Motion for Class Certification (the "Motion"), filed February 21, 2014. On March 31, 2014, Defendants Air to Ground Services, Inc. ("ATG") and Federal Express Corporation ("FedEx") (together, "Defendants") filed separate Oppositions (respectively, the "ATG Opposition" and "FedEx Opposition"). Plaintiffs filed a consolidated

Reply on April 7, 2014, and a Supplemental Reply at the Court's request on April 21, 2014. The Court found this matter suitable for disposition without oral argument and vacated the hearing set for April 28, 2014. *See* Fed.R.Civ.P. 78(b). For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** the Motion.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

In 1997, the city of Los Angeles (the "City") implemented a Living Wage Ordinance (the "LWO") requiring businesses contracting with or receiving financial assistance from the City to pay a wage greater than the required minimum wage and deemed to be a "living wage," which the City has adjusted yearly based on fluctuations in the Consumer Price Index. (First Am. Compl. ("FAC") ¶ 16; Pls.' Req. for Judicial Notice ("RJN"), ECF No. 79, Ex. B(LWO), ECF No. 79–1.) Presently, the LWO requires employers to pay employees either $15.67 per hour or $10.91 per hour plus the equivalent of $4.76 per hour in health benefits. (FAC ¶ 16; RJN, Ex. A.) Employers must also provide employees with 12 compensated days off per year for "sick leave, vacation, or personal necessity" as well as an additional 10 days of uncompensated time off for personal or family illness. L.A. Admin. Code § 10.37.2(b). Los Angeles World Airports ("LAWA") is the municipal department responsible for operating airports located within the City. Entities operating at LAWA airports under public leases or licenses, as well as their subcontractors, must comply with the LWO. (FAC ¶ 18; RJN, Ex. D 24.)

FedEx holds a master lease with LAWA and subcontracts with ATG to clean and maintenance its airplanes and other vehicles at Los Angeles International Airport ("LAX"). (FAC ¶¶ 22–24; Decl. of Brett S. Markson in Supp. of Mot. ("Markson Decl."), ECF No. 75, Ex. 3 ("Subcontract") 5, 9, ECF No. 76–2.) The Subcontract between FedEx and ATG expressly requires ATG to comply with all applicable provisions of the LWO. (FAC ¶¶ 25–29.) FedEx is ATG's only client at LAX. (Decl. of Emily C. Pera in Supp. of FedEx Opp'n ("Pera Decl."), ECF No. 87–2,

Ex. A 10, ECF No. 87–3.) Since May 1, 2010, the City has considered "vehicle cleaners" working at LAWA airports to be owed the prevailing living wage required by the LWO. (FAC ¶¶ 20–21; RJN, Ex. D 27.)

Since late 2009, Torres has worked for ATG cleaning and maintaining aircraft and other vehicles at FedEx's LAX hanger. (FAC ¶¶ 1, 30, 49.) ATG employed Carino in a similar capacity between 2008 and 2012. (FAC ¶¶ 1, 30, 50.) Plaintiffs allege that since May 1, 2010, ATG has failed to pay them, and other current and former vehicle cleaners, the living wage prescribed by the LWO or provide the requisite amount of compensated and uncompensated time off. (FAC ¶¶ 32–34.) Plaintiffs further allege that FedEx acted as their joint employer. (FAC ¶¶ 36, 55–58.)

On August 1, 2012, the City's Office of Contract Compliance (the "OCC") began an investigation into ATG's compliance with the LWO in response to an employee complaint. (Markson Decl., Ex. 11, ECF No. 78–2.) The OCC made an initial determination that ATG's time-off policy and wages were not in compliance with the LWO on December 17, 2012, and sent ATG a final notice to correct (the "Final Notice") on February 25, 2014. (Decl. of Nina Huerta in Supp. of ATG Opp'n ("Huerta Decl."), Exs. B–C, ECF No. 93–2.) On March 4, 2014, ATG acquiesced to the OCC's Final Notice and adjusted its current wages and time-off policy for vehicle cleaners like Plaintiffs. (Decl. of Chris Nilest in Supp. of ATG Opp'n ("Nilest Decl.") ¶¶ 3–5, ECF No. 93–1.) Also in March 2014, ATG issued checks to current and former cleaners for the unpaid compensation to which they would have been entitled under the LWO between May 1, 2010 and March 4, 2014. (Nilest Decl. ¶ 4.)

On March 13, 2013, Plaintiffs filed this putative class-action lawsuit against Defendants in the Superior Court of California for Los Angeles County. (Notice of Removal ("Notice") ¶ 1, ECF No. 1.) Defendants removed the action to this Court on May 3, 2013. (*See generally* Notice.) In the operative FAC, Plaintiffs assert four causes of

action:[1] (1) failure to pay a living wage, in violation of the LWO, L.A. Admin. Code §§ 10.37, *et seq.* (FAC ¶¶ 51–61); (2) unfair business practices, in violation of California's Unfair Competition Law (the "UCL"), Cal. Bus. & Prof.Code §§ 17200, *et seq.* (FAC ¶¶ 62–71); (3) waiting time penalties, in violation of California Labor Code section 203 (FAC ¶¶ 72–75); and (4) inaccurate wage statements, in violation of California Labor Code section 226(a) (FAC ¶¶ 76–80). On July 8, 2013, the Court stayed the action pending the outcome of the OCC's investigation. (Order Granting ATG's Mot. to Stay 4, ECF No. 39.) The Court lifted the stay on January 8, 2014. (Mins. of Status Conf., ECF No. 50.)

On February 21, 2014, Plaintiff filed the instant Motion, seeking certification of a class (the "Class") defined as: "All current and former non-exempt employees of ATG who work (or worked) at ATG's LAX location from March 13, 2009 through the final disposition of this action." (Mot. 20.) Plaintiffs also propose a subclass (the "Subclass") consisting of "all members of the Class whose employment with ATG has terminated and who were not paid all compensation due at the time of termination." (Mot. 20.)

## II. DISCUSSION

"Class actions have two primary purposes: (1) to accomplish judicial economy by avoiding multiple suits; and (2) to protect the rights of persons who might not be able to present claims on an individual basis." *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 647 (C.D.Cal.1996) (citing *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983)). Rule 23(a) of the Federal Rules of Civil Procedure provides that a class action is only appropriate if four prerequisites are met: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly

and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). If all of these prerequisites are satisfied, the court must then determine whether the class action is maintainable under one of Rule 23(b)'s subdivisions. Fed.R.Civ.P. 23(b).

■ A party seeking to certify a class may not merely rest on his pleadings. Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are **in fact** sufficiently numerous parties, common questions of law or fact, etc." *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) (emphasis in original). "[A]ctual, not presumed, conformance with Rule 23(a) remains ... indispensable." *Gen. Tel. Co. of SW v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Trial courts are expected to engage in a "rigorous analysis" to determine if the prerequisites of Rule 23 have been satisfied. *Dukes,* 131 S.Ct. at 2551 (quoting *Falcon,* 457 U.S. at 161, 102 S.Ct. 2364). This rigorous analysis will often "overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id.; see also Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* —— U.S. ——, 133 S.Ct. 1184, 1195, 185 L.Ed.2d 308 (2013) ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

### A. Standing to Sue FedEx

■ In its opposition, FedEx primarily argues that the Class cannot be certified because neither Plaintiff has standing to sue FedEx. (*See generally* FedEx Opp'n, ECF No. 92.) In most situations, federal courts should attend to standing and other questions of subject matter jurisdiction before addressing class certification. *Easter v. Am. W. Fin.,* 381 F.3d 948, 962 (9th Cir.2004) (citing *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 831, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999)); *Lierboe v. State Farm Mut. Auto.*

---

1. Plaintiffs assert a fifth cause of action, but it is a request for declaratory relief based on their other claims. (FAC ¶¶ 81–83.)

*Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir.2003); *Melendres v. Maricopa Cnty.*, No. CV 07–02513 PHX, 2009 WL 2707241, at *6–7 (D.Ariz. Aug. 24, 2009). To satisfy the Article III standing requirements, a plaintiff must show that: (1) he has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561, 112 S.Ct. 2130. "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* At the class certification stage that means Plaintiff's case must be able to withstand a "rigorous analysis [that] will entail some overlap with the merits of the . . . underlying claim." *Dukes*, 131 S.Ct. at 2551; *accord Unthaksinkun v. Porter*, No. C 11–00588 JLR, 2011 WL 4502050, at *7 (W.D.Wash. Sept. 28, 2011).

Plaintiffs counter that "FedEx improperly seeks summary judgment" at the class certification stage by raising the issue of standing. (Reply 9, ECF No. 100.) Adopting Plaintiffs' position and delaying a standing determination, however, would violate basic notions of subject matter jurisdiction as well as flaut the typicality and adequacy requirements of Rule 23(a). *See, e.g., Lee v. State of Oregon*, 107 F.3d 1382, 1390 (9th Cir.1997) ("[T]he fact that Plaintiffs filed their complaint as a class action is of no moment. Standing is a jurisdictional element that must be satisfied prior to class certification." (internal citation and quotation marks omitted)); *Turcios v. Carma Labs., Inc.*, 296 F.R.D. 638, 648 (C.D.Cal.2014) ("As with the typicality requirement, the adequacy requirement fails because Plaintiff has not demonstrated standing for the majority of the claims for which he seeks class certification."). Nor is the Court persuaded that the issue is better left for class-wide resolution

because an adverse finding on Plaintiffs' standing signifies a similar deficiency for the entire Class. (*See* Reply 10.) Plaintiffs cannot proceed with a cause of action collectively that they would be barred from asserting individually, *see Lierboe*, 350 F.3d at 1022 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)), and this threshold inquiry is more, not less, imperative when it could demonstrate that other class members lack standing, *see Bishop v. Saab Auto. A.B.*, No. CV 95–00721 JGD, 1996 WL 33150020, at *5 (C.D.Cal. Feb. 16, 1996) (class cannot be so broadly defined that it embraces "members who have suffered no injury and therefore lack standing to sue"); *Dioquino v. Sempris, LLC*, No. CV 11–05556 SJO, 2012 WL 6742528, at *5 (C.D.Cal. Apr. 9, 2012) (same).

### 1. *Definition of "Employer"*

■ In the FAC, Plaintiffs assert their four causes of action against FedEx on a theory of joint-employer liability. (FAC ¶¶ 55–58.) FedEx contends that Plaintiffs' injuries are not "fairly traceable" to FedEx because they cannot meet their burden of showing joint-employer liability at this stage in the litigation. (FedEx Opp'n 11–12.) In their briefs, the parties base their arguments for and against employment on the factors articulated by the Ninth Circuit in *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465 (9th Cir.1983), and subsequent cases. (*See* FedEx Opp'n 14–15; Suppl. Reply to FedEx Opp'n ("Suppl. Reply") 1–2, ECF No. 106.) The parties' reliance on this line of precedent, however is problematic because the cases apply federal, not state and local, labor law. *See, e.g., Moreau v. Air France*, 356 F.3d 942, 946–47 (9th Cir.2004) (applying the Family Medical Leave Act); *Torres–Lopez v. May*, 111 F.3d 633, 639–40 (9th Cir.1997) (applying the Agricultural Worker Protection Act and the Fair Labor Standards Act (the "FLSA")); *Bonnette*, 704 F.2d at 1469–70 (applying the FLSA). To the extent that the cited cases rely on federal law to resolve state labor law claims, they do so under the assumption that "[state] courts would likely adopt the . . . FLSA's broad definition of 'employment.'" *Bureerong v. Uvawas*, 922 F.Supp.

1450, 1470 (C.D.Cal.1996); *see also Torres–Lopez,* 111 F.3d at 644 (federal cases interpreting "employ" under the FLSA are persuasive authority for claims brought under Oregon labor law). Because Plaintiffs assert only violations of state and local law, the Court must begin its inquiry by looking to the LWO and to California wage and hour law. Resort to the interpretation of federal statutes is appropriate only if California courts explicitly or implicitly adopt federal law as persuasive authority for interpreting state and local definitions of employment. *Bureerong,* 922 F.Supp. at 1470 n. 21.

All of Plaintiffs' claims are predicated on Defendants' alleged violation of the LWO, which permits aggrieved employees to bring a civil suit against "an employer." *See* L.A. Admin. Code § 10.37.6. Although the use of the indefinite article could be construed to permit suit against any entity that falls within the LWO's definition of "employer," this construction would unconstitutionally expand liability and defy common sense. *See Lujan,* 504 U.S. at 576, 112 S.Ct. 2130. There must be some employment relationship between the employee suing and the employer sued. *Martinez v. Combs,* 49 Cal.4th 35, 49, 109 Cal.Rptr.3d 514, 231 P.3d 259 (2010). The LWO's definition of "employer," however, is of little help in ascertaining whether the parties are engaged in an employment relationship subject to the LWO's provisions. The definition simply lists a variety of legal entities that qualify as employers if they accept financial assistance from or contract with the City. *See* L.A. Admin. Code § 10.37.1(g). In the absence of language explicitly defining "employer" or "employment," the Court looks to the purpose behind the LWO for clues to its intended scope.

■ The City passed the LWO because the "procurement by contract of services has all too often resulted in the payment . . . of wages at or slightly above the minimum required by federal and state minimum wage laws . . . [which] tends to inhibit the quantity and quality of services rendered to . . . the City and to the public." L.A. Admin. Code § 10.37. Because the LWO does not discriminate among various state and federal minimum wage statutes, it should be interpreted to apply broadly to any worker for whom the applicable minimum wage is less than the LWO's rate. A narrower construction would exclude some number of service providers from the LWO's ambit, leaving them to earn less than a living wage and frustrating the City's stated goal. As such, the Court should look to the state or federal minimum wage statute with the most expansive definition of "employer" or "employment."

■ The Supreme Court of California has recently held that state courts should apply the definition of "employer" promulgated by the Industrial Welfare Commission (the "IWC") when deciding state wage and hour claims. *See Martinez,* 49 Cal.4th at 68, 109 Cal.Rptr.3d 514, 231 P.3d 259; *Futrell v. Payday Cal., Inc.,* 190 Cal.App.4th 1419, 1428, 119 Cal.Rptr.3d 513 (2010) (applying IWC definition in claim for violation of California Labor Code sections 203 and 226). The court also found that the IWC's definition of "employer" is designed to afford greater protection to employees than the FLSA's definition of that term. *Martinez,* 49 Cal.4th at 68, 109 Cal.Rptr.3d 514, 231 P.3d 259. Adopting the definition of "employer" applied in state wage and hour cases is also appropriate because the City is a political subdivision of the State of California, Cal. Const. art. XI, § 7, and—as is the case here—many plaintiffs suing to enforce the LWO are likely to be California citizens wishing to assert related state wage and hour violations.

■ The IWC's Wage Order No. 9, regulating conditions in the transportation industry, expressly covers vehicle cleaners such as Plaintiffs. Cal.Code Regs. tit. 8, § 11090(2)(N). Wage Order No. 9 defines an "employer" as "any person . . . who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person," and further defines "employ" as "to engage, suffer, or permit to work." tit. 8, § 11090(2)(E)-(F). The Supreme Court of California has recently provided guidance on how to apply these definitions in the context of joint-employment. *Martinez,* 49 Cal.4th at 52, 109 Cal.Rptr.3d 514, 231 P.3d 259. It

has articulated three legal formulations of what it means to "employ" someone: "[1] to exercise control over the wages, hours or working conditions, or [2] to suffer or permit to work, or [3] to engage, thereby creating a common law employment relationship." *Id.* at 64, 109 Cal.Rptr.3d 514, 231 P.3d 259. Here, the parties' arguments, structured as they are on the federal test for employment, hew most closely to *Martinez'* first formulation of what it means to be an employer.

### 2. *Application of Martinez' Definition for "Employer"*

◼ Under *Martinez*'s first formulation, one acts as an employer when he "exercise[s] control over [another's] wages, hours or working conditions." *Martinez*, 49 Cal.4th at 64, 109 Cal.Rptr.3d 514, 231 P.3d 259. Unlike the multi-factor test employed in federal cases, *see Moreau*, 356 F.3d at 946–47, any one of the three aspects—wages, hours, or working conditions—is sufficient to impute employer liability under California wage and hour law. *Id.* at 59, 109 Cal.Rptr.3d 514, 231 P.3d 259. Because this definition is in the disjunctive, it "has the obvious utility of reaching situations in which multiple entities control different aspects of the employment relationship, as when one entity, which hires and pays workers, places them with other entities that supervise the work." *Id.* The test is also "broad enough to reach through straw men and other sham arrangements to impose liability for wages on the actual employer." Although the Subcontract between Defendants specifically states that ATG is FedEx's subcontractor (Subcontract 4), Plaintiffs argue that, in practice, FedEx acts as their employer.

#### a. *Control over Wages*

Plaintiffs first contend that "FedEx strongly influences the pay rates of ATG cleaners" because FedEx pays ATG for its services based on the number of man hours worked each week by ATG cleaners. (Suppl. Reply 4; *see also* FAC ¶ 58(c).) In the Subcontract, ATG agrees to "provide sufficient manpower to clean FedEx's hanger facilities" and FedEx agrees to compensate ATG on the basis of how many man hours it takes ATG cleaners to complete the required amount of cleaning. (Subcontract 1, 9–10.) FedEx guarantees one rate schedule for the first 750 man hours submitted by ATG each week and a lower rate schedule for each additional man hour submitted. (Subcontract 9–10.) Plaintiffs argue that "[a]n inference may be drawn that ATG paid rates below the 'living wage' due to that compensation structure." (Suppl. Reply 4.)

There is, however, no evidence that the rate schedules in the Subcontract are insufficient to cover ATG's operating costs. Even if Plaintiffs are correct that ATG paid them wages below the LWO threshold, in whole or in part, because the pay schedules negotiated in the Subcontract were insufficient to cover the costs associated with ATG's LAX operation, this does not indicate that FedEx exercises control over their wages in a manner that would impute wage and hour liability. *See Martinez*, 49 Cal.4th at 72, 109 Cal. Rptr.3d 514, 231 P.3d 259; *Arredondo v. Delano Farms Co.*, 922 F.Supp.2d 1071, 1088 (E.D.Cal.2013) (finding control over wages where contractor and client "expressly negotiated and set plaintiffs' rate of pay as part of their contract."). In order to exercise control within the meaning of the IWC's definition, FedEx would need total knowledge of ATG's overhead and the ability to coerce ATG into submitting a bid that could never cover these costs: two factors Plaintiffs do not support with competent evidence. (*See* FedEx Opp'n 5.) Even if the contractual rate schedules were insufficient and FedEx knew as much, it does not follow that FedEx knew that ATG was paying its employees less than the prevailing living wage. The Subcontract between Defendants expressly required ATG to comply with all applicable provisions of the LWO. (Subcontract 5.) There are a number of business justifications for agreeing to a loss-making contract, and there is evidence that ATG had cleaning contracts with FedEx and a second client at three other airports across the United States, the profits from which ATG could direct to its LAX operation in order to meet the LWO's demands. (*See* Pera Decl., Ex. A 10, 14–16.) The only inference the Court can draw from the Subcontract's compensation structure is that, for

whatever reason, ATG may have failed to negotiate rates sufficient to cover its operating costs, but the Court can infer no more.

### b. *Control over Hours*

Plaintiffs next argue that FedEx exercises control over their hours because FedEx "sets the exact number of shifts per day and days per week that [it] expects ATG to perform." (Mot. 3 n. 1 (citation and punctuation omitted).) The Subcontract obligates ATG to "[p]rovide adequate employees for [the] work scope as highlighted in **sample** work schedule below." (Subcontract 10 (emphasis added).) The sample work schedule included in the Subcontract purports to "set forth ... the exact number of shifts per day and days per week that FedEx expects the Contractor to perform services at the Location." (Subcontract 11.) There is no evidence, however, that FedEx requires ATG to adhere to this sample schedule or any other. In fact, all evidence indicates that ATG alone controls Plaintiffs' hours. "FedEx allows ATG to schedule [its] employees such that they provide optimal coverage for the operation on a given day." (Decl. of George Murphy in Supp. of FedEx Opp'n ¶ 25, ECF No. 92–11.) ATG determines Plaintiffs' shifts and when they are eligible to work overtime or take vacation based on the estimated workload for a given week. (Decl. of Jeff Miller in Supp. of FedEx Opp'n ("Miller Decl.") ¶ 7, ECF No. 92–6; Pera Decl., Ex. B ("Torres Dep.") 208–12, ECF No. 105–1; Ex. C ("Carino Dep.") 156–59, ECF Nos. 105–2, 105–3.) Although the number of shifts ATG schedules in a given week are to some degree dependent on the amount of traffic going through FedEx's hanger, ATG ultimately determines how many man hours are required to ensure that it is complying with its contractual obligations. This is insufficient to demonstrate that FedEx controls Plaintiffs' hours.

### c. *Control over Working Conditions*

██ Plaintiffs present several aspects of their daily employment over which FedEx exercises control. First, Plaintiffs make much of the fact that the Subcontract requires ATG to provide a list of employees for security screening as well as specifies that ATG must implement background check and drug-testing procedures. (Mot. 3 n. 1; Suppl. Reply 3–4.) A contract requiring a subcontractor to implement such security measures with respect to its current and prospective employees is not unreasonable when the client is contracting for services to be performed in a secure location such as an airport hanger. The evidence indicates that ATG implemented the contractual procedures without direction from FedEx. (*See* Decl. of Claudia Pham in Supp. of FedEx Opp'n ¶¶ 4–5, ECF No. 92–9; Torres Dep. 166–67, 172, 194–96; Carino Dep. 140, 151.) Moreover, many of the security procedures outlined in the Subcontract are required by the Federal Aviation or Transportation Security Administrations; they simply require ATG to comply with applicable federal law. (*See* Subcontract 12–14.) Such contractual restrictions are necessary given the nature and location of the services to be performed and do not demonstrate control over daily working conditions. *See Martinez*, 49 Cal.4th at 75–76, 109 Cal.Rptr.3d 514, 231 P.3d 259.

Plaintiffs other evidence is more persuasive. Plaintiffs present evidence that FedEx provided all of Plaintiffs equipment and supplies, trained Plaintiffs on how to perform their cleaning tasks, supervised Plaintiffs' work, assigned tasks to Plaintiffs directly, and influenced ATG's hiring and firing. (*See generally* Mot. 3 n. 1; Suppl. Reply 2–3.) More specifically, Plaintiffs offer declarations as evidence that ATG managers fostered a "First is FedEx" culture in the hanger, instructing Plaintiffs and other cleaners to follow instructions received directly from FedEx employees. (Decl. of Carino in Supp. of Mot. ("Carino Decl.") ¶¶ 6–7, ECF No. 73; Torres Dep. 231–32; Decl. of Torres in Supp. of Suppl. Reply ("Torres Suppl.") ¶¶ 10, 17–19, ECF No. 106–1; Decl. of Raul Leos in Supp. of Suppl. Reply ("Leos Decl.") ¶¶ 8, 13–14, ECF No. 106–4; Decl. of Carino in Supp. of Suppl. Reply ("Carino Suppl.") ¶ 12, ECF No. 106–2; Decl. of Salvador Lopez in Supp. of Suppl. Reply ("Lopez Decl.") ¶¶ 8, 10, ECF No. 106–3.) Plaintiffs relate instances where ATG managers were not told of tasks requested by FedEx employees and even one case where a FedEx employee ordered Torres not to bother informing his

ATG supervisor. (Torres Suppl. ¶¶ 17–18; Leos Decl. ¶ 8; Lopez Decl. ¶ 10.) In addition, Plaintiffs offer declarations describing mandatory informal training sessions provided by FedEx on how to use equipment and follow procedures. (Torres Dep. 238; Torres Suppl. ¶¶ 11, 15, 20; Carino Suppl. ¶ 15; Lopez Decl. ¶ 12; Leos Decl. ¶¶ 6, 10–11.) There is also evidence that FedEx employees alone inspect and approve Plaintiffs' cleaning tasks and that the FedEx employees train cleaners in the proper cleaning techniques when performance is deficient. (Torres Suppl. ¶¶ 11–13; Carino Suppl. ¶ 10; Lopez Decl. ¶ 15; Leos Decl. ¶ 9.) Finally, Plaintiffs' declarations relate incidents where ATG employees sought FedEx's input before making hiring and firing decisions. (Torres Suppl. ¶¶ 2, 21; Leos Decl. ¶¶ 2–3.)

FedEx concedes that it controls the hanger where Plaintiffs work and provides them with all of their tools and supplies. (FedEx Opp'n 7–8; Subcontract 10.) But while FedEx admits that its employees occasionally assign work to ATG cleaners and inspect their cleaning, it contends that this occurs irregularly and on a scale far below that alleged by Plaintiffs. (*See* FedEx Opp'n 8–9.) FedEx denies it trained Plaintiffs or influenced ATG's hiring and firing. (FedEx Opp'n 5–6, 9–10.) On the points that FedEx disputes, however, it offers only evidence of ATG's standard operating procedures and anecdotal evidence deviations from these procedures are infrequent. The gist of Plaintiffs' argument is that procedures are regularly ignored in practice, and that FedEx employees exercise effective supervisory control over Plaintiffs even if such control is not formally written into the Subcontract. The fact that ATG's only LAX client is FedEx and that Plaintiffs work alongside FedEx employees in the FedEx hanger cleaning exclusively FedEx vehicles only amplifies Plaintiffs' sense of obedience to FedEx. *See Martinez*, 49 Cal.4th at 76, 109 Cal.Rptr.3d 514, 231 P.3d 259 (sense of obedience to the defendant's representatives indicates control).

FedEx's level of control might not satisfy the *Martinez* standard based solely on the undisputed facts, but it does if the Court accepts Plaintiffs' version of the disputed facts as true. *See id.* (influence in hiring and direct supervision are indicia of control); *see also Aleksick v. 7–Eleven, Inc.*, 205 Cal. App.4th 1176, 1190, 140 Cal.Rptr.3d 796 (2012) (same); *Futrell*, 190 Cal.App.4th at 1431, 119 Cal.Rptr.3d 513 (same). Although the Court must examine the propriety of class certification rigorously, the standard of review cannot be more rigorous than it would on a Rule 56 motion for summary judgment. *See* Fed.R.Civ.P. 56(a). Because the competing declarations provided by the parties leave a number of material facts in dispute, the Court finds that Plaintiffs have shown their injuries are fairly traceable to FedEx for the purposes of the instant Motion.

### B. *Class Definition*

As an initial matter, ATG challenges Plaintiffs' proposed definition for the Class. (ATG Opp'n 8, ECF No. 93.) In the Motion, Plaintiffs begin the Class period from March 13, 2009. (Mot. 20.) In the FAC, however, Plaintiffs specifically allege that "since May 1, 2010, the LWO covered vehicle cleaners employees [sic] like Plaintiffs." (FAC ¶¶ 21, 32.) This date is echoed by the OCC's preliminary findings and Final Notice, which order ATG to provide backpay to its employees starting on May 1, 2010. (Huerta Decl., Exs. B–C.) Plaintiffs argue that they can set the Class period at March 13, 2009 because "the OCC did not examine the period prior to May [1], 2010," and therefore the LWO's applicability before that date remains an open question. (Reply 7.) Plaintiffs' argument does not change the fact that they specifically allege May 1, 2010, as the date that Defendants began to violate the LWO. Plaintiffs cannot certify a class that contains members whom, according to their own pleadings, suffered no injury. *See Bishop*, 1996 WL 33150020, at *5. Accordingly, the Class period must be redefined to current and former ATG cleaners employed from May 1, 2010, to March 4, 2014, the effective date that ATG changed its wage scale and time-off policies to provide LWO-level compensation.[2]

2. The Court notes that the Class' recovery for waiting time penalties is not limited to the dates

## C. Rule 23(a) Requirements

### 1. Numerosity

■ The numerosity requirement is met where the party seeking certification shows the class is "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). "A proposed class of at least forty members presumptively satisfies the numerosity requirement." *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 473 (C.D.Cal. 2012); *see also Jordan v. Cnty. of Los Angeles*, 669 F.2d 1311, 1319 (9th Cir.1982), *vacated on other grounds*, 459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982). The number of Class members must also be presently ascertainable based on objective criteria. *See Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir.1978); *O'Connor v. Boeing N. Am., Inc.*, 180 F.R.D. 359, 367 (C.D.Cal.1997).

■ Based on ATG's payroll records, Plaintiffs have compiled a list of current and former ATG employees working as vehicle cleaners at LAX. (Suppl. Decl. of Brad S. Kane ("Suppl. Kane Decl.") ¶¶ 2–10, Ex. 1, ECF No. 100–1.) ATG's payroll records show that there were 63 individuals employed in this capacity from March 13, 2009, through February 4, 2014. (Suppl. Kane Decl. ¶ 9, Ex. 1.) Thirty-four of these individuals no longer work for ATG as vehicle cleaners. (Suppl. Kane Decl. ¶ 9, Ex. 1.) Sixty-three individuals would satisfy the numerosity requirement, but this figure may include individuals who only worked between March 13, 2009, and April 29, 2010, and who therefore do not qualify as Class members. Nor does it include cleaners hired between February 4, 2014, and March 4, 2014, though there is no indication of whether or not such individuals exist.

On the other hand, ATG admits that it has employed at least 47 individuals as cleaners since May 1, 2010 (Markson Decl., Ex. 9 ("Nilest Dep.") 31–32, ECF Nos. 82–1, 82–2), and Defendants concede that a class of 47 members would make joinder impracticable

(ATG Opp'n 14). ATG attempts to reduce this 47–person figure by pointing to evidence that approximately 10 to 20 percent of vehicle cleaners were never paid below the prevailing living wage. (ATG Opp'n 15; Nilest Dep. 135.) Plaintiffs do not dispute the validity of this 10 to 20 percent estimate but do argue that it includes managers and other exempt employees. (Reply 1.) The Court disagrees. The context of the deposition makes clear that ATG's person most knowledgeable is specifically discussing non-exempt employees when he provides the estimate. (Nilest Dep. 132–36.)

However, the fact that up to 20 percent of the proposed Class members never earned below the prevailing living wage does not mean that they should be excluded from the Class. Although each cause of action asserted in the FAC is predicated on a violation of the LWO, Plaintiffs allege three separate theories of liability. Plaintiffs allege that Defendants' violated the LWO not only by paying insufficient wages but also by failing to provide the required amount of compensated and uncompensated time off. (Reply 2; FAC ¶ 54.) Even Class members never paid below the prevailing living wage would be injured by a time-off policy that contravenes the LWO. There is evidence that ATG had an established policy regarding both types of time off and that this policy did not comply with the LWO. (*See* Huerta Decl., Exs. C–D; Decl. of Torres in Supp. of Mot. ("Torres Decl.") ¶ 7, ECF No. 72, Ex. 17 4–8, ECF No. 72–2.) As such, the Court finds that the Class is sufficiently numerous and presently ascertainable based on ATG's payroll records.[3]

### 2. Commonality

■ Commonality under Rule 23(a)(2) "requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes*, 131 S.Ct. at 2551 (internal citation omitted). This "does not mean merely that they have all suffered a violation

---

of employment in the Class definition. For example, an employee terminated on March 4, 2014, but not given unpaid LWO wages until March 25, 2014, would still be able to recover applicable waiting time penalties.

3. Plaintiffs will need to construct a new list of employees who worked as cleaners from May 1, 2010, to March 14, 2014, from ATG's payroll records.

of the same provision of law." *Id.* Rather, class-wide claims "must depend on a common contention ... of such a nature that ... determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.; accord Abdullah v. U.S. Sec. Assocs., Inc.,* 731 F.3d 952, 957 (9th Cir.2013) (common answers generated must be "apt to drive the resolution" of class claims).

■■■ Plaintiffs are correct that there is a common legal question as to whether Class members were owed a living wage during the period from May 1, 2010, through March 4, 2014. (*See* Mot. 12.) Each of Plaintiffs' claims are predicated on Defendants' alleged violations of the LWO. Plaintiffs cannot establish Defendants' liability on any claim unless they show the Class was within the LWO's scope. (*See* FAC ¶¶ 65–66, 75, 79, 83; Reply 3.)[4] Ascertaining whether the LWO applied to the Class is necessary to prove an cognizable injury for each claim and thus presents at least one common question of law.

ATG, however, compares the instant case to *Dukes* and contends that the question of whether the LWO covers the Class proves only that Class members have suffered a violation of the same provision of law, not the same injury. (ATG Opp'n 10.) ATG's argument misreads *Dukes*. In that case, the plaintiffs attempted to tie together a class of employees subjected to various, discrete instances of sex discrimination based on the fact that each discriminatory event was a violation of Title VII. *Dukes,* 131 S.Ct. at 2552. Defendants overlook a fundamental difference between the Title VII claims asserted in *Dukes* and the LWO violation asserted here. "[I]n resolving an individual's Title VII claim, the crux of the inquiry is 'the reason for a particular employment decision.'" *Id.* (quoting *Cooper v. Fed. Reserve Bank of Richmond,* 467 U.S. 867, 876, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984)). A violation of the LWO, on the other hand, requires no inquiry into Defendants' reasons; it is a

strict liability offense. L.A. Admin. Code § 10.37.6. Class members suffer the same injury simply by virtue of not receiving the proper compensation. Defendants would have the Court consider each injury to be the same only if every Class member were underpaid by the same amount. (*See* ATG Opp'n 10–11.) Although the strict-liability nature of the offense makes specific proof of underpayment a necessity, the exact amount of the shortfall is more akin to a damages calculation than a substantive element. *Cf. Leyva v. Medline Indus. Inc.,* 716 F.3d 510, 513 (9th Cir.2013) (holding that determination of shortfalls in payroll for each employee did not prevent certification). The only question is whether the LWO applies, not the amount withheld.

FedEx argues that the issue of joint employment does not present a common question and therefore the Class cannot be certified as to it. (FedEx Opp'n 22–25.) Even in light of the Court's finding that Plaintiffs have sufficiently demonstrated standing to proceed to the class certification stage, FedEx contends that "an individualized inquiry would be needed to determine if FedEx comparably 'controlled' other members of the putative [C]lass." (FedEx Opp'n 24.) Although Plaintiffs rely primarily on anecdotal evidence to demonstrate that FedEx was their employer, this does not make the issue of joint employment an individualized inquiry. Plaintiffs provide evidence of several practices, many informal, that could reasonably have caused Class members to "view[ ] the [FedEx] representatives as their supervisors or believe[ ] they owed their obedience to [FedEx]." *Martinez,* 49 Cal.4th at 76, 109 Cal.Rptr.3d 514, 231 P.3d 259. The informal practices described by Plaintiffs are no less capable of fostering this environment than polices enshrined in a contract or handbook. Although the *Martinez* court employs language indicating that the standard for control relies on each employee's subjective state of mind, such as "view" and "believe,"

---

4. Although the OCC determined that the LWO has applied to ATG since May 1, 2010, administrative decisions only have preclusive effect under specific circumstances, which have been left unaddressed by the parties. *United States v.*

*Utah Const. & Min. Co.,* 384 U.S. 394, 421–22, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *Plaine v. McCabe,* 797 F.2d 713, 720 (9th Cir.1986). Also, the question of whether the OCC's decision has preclusive effect is itself a common question.

the question is an objective one: whether there is sufficient evidence such that a reasonable cleaner would view FedEx representatives as his supervisors. Thus, the focus is on the collective conduct of FedEx employees, not the actions or beliefs of individual Class members. FedEx's conduct is a common question of fact, and whether it demonstrates control over working conditions is a common question of law.

### 3. *Typicality*

Under Rule 23(a)'s "permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir.1998). Typicality tests whether putative class members "have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); *see also Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). A finding of typicality may be "inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir.1990) (internal quotation marks omitted)).

Plaintiffs argue that they are similarly situated to the Class because they "have been subjected to the same unlawful practices due to Defendants' failure to comply with the LWO." (Mot. 13.) This is true with respect to Plaintiffs' first cause of action for violations of the LWO. Both Plaintiffs are similarly situated to Class members with respect to ATG's policy regarding compensated time off simply by virtue of having been employed by ATG (*see* Torres Decl., Ex. 17 4–8; Huerta Decl., Exs. C–D), and Carino was denied uncompensated time off (Huerta Decl., Ex. H 63–66). Both Plaintiffs, moreover, allege that they were not paid the prevailing living wage at some point during their tenure with ATG. (FAC ¶¶ 49–50; Tor-res Decl. ¶ 6; *see also* Decl. of Steve Rose in Supp. of Mot. ¶ 4, ECF No. 74.) ATG points out that both Plaintiffs received the prevailing wage at certain times during their tenure, but concedes that they were each paid less than the living wage at other times. (*See* ATG Opp'n 11.)

Plaintiffs' third cause of action for waiting time penalties is limited to the Subclass of cleaners who are no longer employed by ATG. (*See* Mot. 20; FAC ¶¶ 72–75.) The same facts that make Carino typical of the Class make him typical of the Subclass. The California Labor Code requires employers to pay employees all earned but unpaid wages and benefits within a certain time frame following the employee's resignation or discharge. *See* Cal. Lab.Code §§ 201–03, 227.3. Plaintiffs argue that terminated and discharged employees were owed the alleged shortfall between their actual wages or accrued time off and the wages or benefits required under the LWO. Since Carino complains that he was undercompensated per the LWO and that he did not receive the shortfall upon the termination of his employment, he suffered the same injury as all Subclass members under Plaintiffs' theory of liability.

ATG contends that neither Plaintiff is typical of the Class with respect to the final cause of action for inaccurate wage statements because Plaintiffs did not suffer an injury as the result of the alleged inaccuracies. (ATG Opp'n 14.) In support, ATG offers evidence that neither Plaintiff's wage statements were inaccurate or misleading in any respect other than the fact that their statements listed the sub-living wage actually received rather than the allegedly applicable living wage. (Huerta Decl., Ex. G 142, 279–82, Ex. H 118–19.) Plaintiffs do not dispute that this discrepancy is the sole basis for their injuries, which relate to their confusion and "the difficulty and expense of reconstructing time records." (Mot. 18 (citations omitted); Reply 3.) In essence, ATG's typicality objection is an argument that this theory of liability is not viable. However, ATG declined to file a motion to dismiss in response to Plaintiffs' FAC, and this is not the proper forum for Defendants to challenge the legal merits of Plaintiffs' alleged injury. *See*

Fed.R.Civ.P. 12(b), (h)(2); *Kim v. Commandant, Def. Language Inst.*, 772 F.2d 521, 524 (9th Cir.1985) (per curiam) (citing *Wright v. Schock*, 742 F.2d 541, 544 (9th Cir.1984)).[5] With respect to typicality, Plaintiffs allege that they suffered the same alleged injury as other Class members and therefore satisfy the Rule 23(a) requirement. Whether their theory of liability is legally cognizable is a question common to the Class that will need to be addressed in a motion for summary judgment.

#### 4. *Adequacy of Representation*

An examination of adequate representation consists of two questions: "(1) [d]o the representative plaintiffs and their counsel have any conflicts of interest with other class members[;] and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir.2003) (citing *Hanlon*, 150 F.3d at 1020). Plaintiffs argue that "there are no conflicts of any kind" (Mot. 14), and that Plaintiffs' counsel are "experienced in representing employees in individual and class action matters, including wage and hour and [California] Labor Code cases" (Mot. 15; *see also* Markson Decl. ¶¶ 3–5; Decl. of Brad S. Kane in Supp. of Mot. ¶¶ 2–4, ECF No. 70; Decl. of Timothy A. Pico in Supp. of Mot. ¶¶ 2–5, ECF No. 71). Defendants do not challenge Plaintiffs on either point. (*See* ATG Opp'n 16–17; *see generally* FedEx Opp'n.) The Court finds that Plaintiffs' interests do not conflict with those of the Class and that Plaintiffs' counsel are sufficiently capable of handling an action of this complexity.

Defendants, however, raise a separate point in relation to adequacy: Plaintiffs' credibility. ATG lists several "inaccurate" or "false" statements from Plaintiffs' sworn declarations as evidence that Plaintiffs' are not sufficiently credible to represent the Class. (ATG Opp'n 16–17.) In support of this argument, ATG cites three extra jurisdictional cases, the facts of which differ significantly from those presented here. *See, e.g., David-*

*son v. Citizens Gas & Coke Util.*, 238 F.R.D. 225, 229–30 (S.D.Ind.2006). The Court finds that the inconsistencies between Plaintiffs' declarations and their deposition testimony does not demonstrate that they lack the credibility necessary to represent the Class. ATG also attempts to undermine Torres' credibility with evidence of a prior criminal conviction not reported on his application for an airport security badge. (ATG Opp'n 18.) Plaintiffs' have produced evidence that Torres reported his conviction to ATG three months after it occurred. (Suppl. Kane Decl. ¶ 11, Ex. 3.) Moreover, Torres offers a plausible explanation based on ATG's conduct for failing to include the conviction on the badge application in question. (Huerta Decl., Ex. G 201–03.) Given the loose connection between the credibility issues raised by ATG and the substance of the instant matter, the Court finds that Torres' security badge issues and the discrepancies in Plaintiffs' declarations do not render them unfit to represent the Class. As such, Plaintiffs have satisfied the requirements of Rule 23(a) with respect to each of their four claims.

### D. *Rule 23(b)(3) Requirements*

Plaintiffs argue for class certification under the third subdivision of Rule 23(b). (Mot. 15–19.) Subsection (b)(3) contains two distinct elements that courts refer to as the "predominance" and "superiority" requirements. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). In order to be certified, the Class must satisfy both.

#### 1. *Predominance*

Predominance requires "that the questions of law or fact common to all members of the class predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623, 117 S.Ct. 2231. The predominance inquiry is similar to the one

---

**5.** Consideration of FedEx's standing argument was necessary because it went to the Court's

subject matter jurisdiction.

for commonality under Rule 23(a)(2) but it is more rigorous. *Hanlon,* 150 F.3d at 1019. The "main concern in the predominance inquiry . . . [is] the balance between individual and common issues." *In re Wells Fargo Home Mortg. Overtime Pay Litig.,* 571 F.3d 953, 959 (9th Cir.2009). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon,* 150 F.3d at 1022. In contrast, when "claims require a fact-intensive, individual analysis," then class certification will "burden the court" and be inappropriate. *Vinole v. Countrywide Home Loans, Inc.,* 571 F.3d 935, 947 (9th Cir.2009). The inquiry requires a district court to "predict[ ] . . . how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Dukes,* 603 F.3d at 593 (internal citation and quotation marks omitted); *see also Erica P. John Fund, Inc. v. Halliburton Co.,* —— U.S. ——, 131 S.Ct. 2179, 2184, 180 L.Ed.2d 24 (2011).

### a. *LWO Claim*

▮ With one exception, common issues predominate with respect to Plaintiffs' LWO claim. As discussed above, the question of whether the LWO applied to ATG is a question that can be resolved for the entire Class in one stroke. ATG argues that individual questions still predominate because the trier of fact will need to calculate whether each Class member's wages fell below the prevailing living wage, how far below they fell, and for how long. (ATG Opp'n 19.) ATG contends that additional individualized questions will arise because "the LWO . . . contemplates a different rate when certain healthcare contributions are made" by an employer, and ATG's healthcare contributions vary for each employee based on whether they selected a contribution plan and which plan they selected. (ATG Opp'n 20.) The situation ATG presents is no different than the calculation of damages, which though it "is invariably an individual question[,] . . . does not defeat class action treatment." *Leyva,* 716 F.3d at 514 (internal citation and quota-

tion marks omitted). It is unlikely, moreover, that determining each Class members' backpay will prove time consuming. The basis for these calculations exists in ATG's payroll records (Suppl. Req. for Judicial Notice ("Suppl. RJN"), Ex. B ¶¶ 5–7, ECF No. 100–2; Nilest Dep. 115–19, 126–30; Nilest Decl. ¶ 7), and ATG has already used its payroll database to calculate the amount of backpay it believes it owed to employees according to the OCC's Final Notice (*see* ATG Opp'n 24; Huerta Decl., Ex. C; Nilest Decl. ¶¶ 4, 7).

Whether ATG's compensated time-off policy complied with the LWO presents a second common issue. (*See* Torres Decl., Ex. 17 4–5.) Calculating the amount of compensated time off owed to each Class member should prove no more challenging than calculating backpay. (*See* ATG Opp'n 24; Nilest Decl. ¶ 4.) Additionally, there is the common question of whether Defendants willfully violated the LWO. It was ATG's legal position, until the OCC's Final Notice, that Class members were not covered by the LWO. (*See* Huerta Decl., Ex. C; Markson Decl., Ex. 13–14, ECF Nos. 78–4, 85–1.) Whether this position was taken in good or bad faith is relevant to the question of willfulness and depends on ATG's conduct as opposed to the conduct of individual Class members. *See FEI Enters., Inc. v. Kee Man Yoon,* 194 Cal.App.4th 790, 802, 124 Cal.Rptr.3d 64 (2011) (citing *Amaral v. Cintas Corp.,* 163 Cal.App.4th 1157, 1201, 78 Cal.Rptr.3d 572 (2008)) (good-faith reliance on a legal position negates a finding of willfulness). This makes the factual issues related to ATG taking the legal position it did ripe for class determination. Similarly, FedEx's alleged status as joint employer requires the investigation of common questions of fact regarding the conduct of FedEx's representatives. As such, Plaintiffs have shown that common issues predominate over individualized ones insofar as their LWO claim is based on inadequate wages and compensated time off.

The one aspect of Plaintiffs' LWO claim that raises predominance concerns is whether ATG's policy for uncompensated time off violated the LWO. (*See* Torres Decl., Ex. 17 5–8.) Although the question of whether the

policy complied with the LWO is common to the Class, determining whether a given Class member suffered any injury due to the policy, in the event it is found unlawful, requires an individualized assessment. The LWO provides that "[e]mployers shall ... permit employees to take at least an additional ten ... days a year of uncompensated time **to be used for sick leave for the employee or a member of his or her immediate family.**" L.A. Admin. Code § 10.37.2(b) (emphasis added). ATG's policy permits uncompensated leave for these purposes, and more, but conditions it upon ATG's prior authorization or a doctor's note. (Torres Decl., Ex. 17 5–8.) In order to ascertain whether a Class member was ever injured by ATG's policy the Court must inquire into whether each member was denied uncompensated time off, the reasons for the Class member's request, whether the reason for the request was sufficiently related to illness, when the request was made, and the context in which the request was presented to the supervisor. Plaintiffs have not shown that Defendants possess records of time off requests, and as a result each Class member will have to provide an account of his verbal requests for uncompensated leave in order for the Court to ascertain whether he suffered an injury at all. Such individualized inquiries are likely to bog down the action in a series of "mini-trials." *See Pryor v. Aerotek Scientific, LLC,* 278 F.R.D. 516, 536 (C.D.Cal.2011). Unlike their other two theories of liability, Plaintiffs have failed to demonstrate that common issues predominate with respect to their theory of liability for uncompensated time off.

### b. *Waiting Time Claim*

■■■ The waiting time claim applies only to the Subclass of former ATG employees, and requires an additional showing that Defendants failed to provide the shortfall of backpay and vacation time owed to the Subclass at the time employment ended. Cal. Lab.Code §§ 201–03, 227.3. This is an individualized inquiry, but a simple one to resolve. If the Subclass member's employment ended before March 4, 2014, then that member did not receive the shortfall. Each member's last day of employment is available in

the same records that ATG used to calculate the backpay it owed its former employees, making this a simple individualized question to resolve.

Plaintiffs must also demonstrate a second element with regard to the waiting time claim: whether Defendants' conduct was willful. Cal. Lab.Code § 203. The question of whether Defendants willfully failed to pay all wages at termination essentially mirrors the willfulness inquiry to be resolved in Plaintiffs' LWO claim. Both depend on whether ATG took its legal position on the LWO's applicability in good faith. Thus, common questions predominate in Plaintiffs' waiting time claim insofar as it is predicated on Defendants' failure to pay the prevailing living wage and the proper value of compensated days off.

### c. *Inaccurate Wage Statement Claim*

■■■ Plaintiffs' claim for inaccurate wage statements is also largely derivative of their LWO claim. *See, e.g., Avilez v. Pinkerton Gov't Servs.,* 286 F.R.D. 450, 464, 472 (C.D.Cal.2012); *Polanco v. Schneider Nat. Carriers, Inc.,* No. CV 10–04565 GHK, 2012 WL 10717265, at \*16 (C.D.Cal. Apr. 25, 2012). Plaintiffs argue that Defendants' failure to note the wages and time off required under the LWO on Class members' wage statements constituted an inaccuracy within the meaning of California Labor Code section 226(a). (Reply 3.) There are two questions unique to this claim. First, Plaintiffs must demonstrate that Class members' wage statements were inaccurate. Cal. Lab.Code § 226(a). Whether printing Class members' actual wages as opposed to the wages allegedly owed under the LWO constitutes an "inaccuracy" within the meaning of the statute is a common question of law. Moreover, the facts necessary to prove this inaccuracy can be satisfied with common proof, namely Defendants' uniform payroll procedures and records of the wage statements themselves. *See Avilez,* 286 F.R.D. at 473 ("Defendant's own payroll records, including dates of employment, paycheck stubs, and timesheets can be used to show the violations and measure damages.").

Second, Plaintiffs must demonstrate that Class members suffered an actual injury as a

result of the inaccurate wage statements. Cal. Lab.Code § 226(e); *Elliot v. Spherion Pac. Work, LLC,* 572 F.Supp.2d 1169, 1181 (C.D.Cal.2008), *aff'd,* 368 Fed.Appx. 761 (9th Cir.2010). ATG contends that individualized questions will predominate over common ones with respect to the actual-injury requirement. (ATG Opp'n 20.) Plaintiffs do not allege a specific injury flowing from the allegedly inaccurate wage statements in the FAC, only that they and the Class "were harmed." (FAC ¶ 79.) However, Plaintiffs indicate in their briefs that the alleged injury was confusion about their time records or rights under the LWO as a result of Defendants' failure to print the prevailing living wage on the wage statements. (Mot. 18; Reply 3.)[6] Courts have considered similar alleged injuries determinable on a class-wide basis. *See, e.g., Arredondo v. Delano Farms Co.,* 301 F.R.D. 493, 546–47, No. CV 09–01247 MJS, 2014 WL 710945, at *62 (E.D.Cal. Feb. 21, 2014) (listing examples of injuries); *Elliot,* 572 F.Supp.2d at 1181 (same). If Plaintiffs later attempt to rely on their vague pleading and articulate an injury not capable of class-wide resolution, the Court can revisit the matter in a properly filed motion for decertification. *See* Fed. R.Civ.P. 23(c)(1)(C). Otherwise, the Court finds that common questions predominate here to the same extent as they do for the LWO claim.

### 2. *Superiority*

■ The "superiority inquiry requires a comparative evaluation of alternative mechanisms of dispute resolution," *Hanlon,* 150 F.3d at 1023, and a class action may prove superior "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency" than other methods, *Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir.1996). In deciding whether a class action would be the superior method for resolving the controversy, the Court considers several factors including: (1) the class members' interest in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation and of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Fed. R.Civ.P. 23(b)(3)(A)-(D).

■ Each of these four factors weighs in favor of class resolution. Plaintiffs assert that there is no similar pending litigation (Mot. 19), and Defendants have not directed the Court to any. Nor do Defendants point to any interest that the Class members might have in individually controlling the prosecution of these claims. Most, if not all, Class members are likely to live in or near this judicial district given that the Class is limited to those currently or recently employed at LAX, making litigation in this Court convenient. Finally, the limited Class size and the nature of the claims and common questions to be addressed in this action indicate that class-wide resolution will reduce litigation costs and promote efficiency.

However, ATG argues against superiority based on a fifth factor: its compliance with the OCC's Final Notice. (ATG Opp'n 21–25.) Specifically, ATG contends that a class-action proceeding would duplicate the work of the OCC without providing any additional relief for the Class. (ATG Opp'n 23–35.) In its Final Notice, the OCC determined that the LWO has applied to the Class since May 1, 2010, and that ATG was in violation of the LWO from that time. (Huerta Decl., Ex. C.) ATG has paid Class members back wages and compensated time off for these alleged violations as well as amended its policies to provide cleaners with the level of compensation stated in the LWO. (Nilest Decl. ¶¶ 3–5.) However, the OCC's Final Notice does not resolve every question presented in the FAC, and ATG's acquiescence to it does not render all of Plaintiffs' requested relief duplicative.

The OCC did not address the alleged California Labor Code violations (*see* Huerta Decl., Exs. B–C), nor does the OCC have the authority to prosecute these claims, Cal. Lab. Code §§ 203, 218, 226. If the California Labor Code claims are resolved in favor of

---

6. This theory may not be a viable basis for liability, *see, e.g., Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), but as discussed above, that is not the question before the Court on the present Motion, *see* Fed.R.Civ.P. 12(b), (h)(2).

the Class, members would be entitled to statutory penalties in addition to the backpay they have already received from ATG. *See id.* §§ 203(a), 226(e)(1). There is also no indication in the Final Notice as to whether the OCC considered the wilfulness of ATG's actions. (*See* Huerta Decl., Ex. C.) Willful violations of the LWO are subject to treble damages, L.A. Admin. Code § 10.37.6(a)(4), another potential source of recovery for the Class. Thus, class-wide resolution of Plaintiffs' claims is not the waste of resources that ATG makes it out to be.

 In one respect, however, ATG's compliance with the Final Notice does impact the certification of Plaintiffs' claims: it eliminates Class members' standing to pursue a certifiable UCL claim. *See Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (internal citation and quotation marks omitted)). Under the UCL, "plaintiffs are generally limited to injunctive relief and restitution." *Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 179, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999) (citing Cal. Bus. & Prof.Code § 17203). In this case, restitution means the difference between a Class member's actual wages and the prevailing living wage for the period from May 1, 2010, to March 4, 2014. (*See* Nilest Decl. ¶¶ 4–5.) In addition, restitution includes the value of any compensated days off required by the LWO but denied to Class members during this period under ATG's former time-off policy. Although Plaintiffs allege that ATG also owes restitution for injuries flowing from the alleged unlawful denial of uncompensated time off, the prevalence of individualized questions prevents the Court from certifying that theory of liability or considering it here. Seeing as ATG has already issued checks to its current and former non-exempt employees for back wages and compensated time off, no further restitu-

tion is available to the Class. And since ATG has formally changed its pay rates and time-off policy, the Class has already obtained what relief the Court could have provided through an injunction. Success on Plaintiffs' UCL claim would not redress any of the Class' outstanding injuries. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105–09, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (holding that injuries were not redressable under analogous circumstances).[7] Thus, the Court cannot certify Plaintiffs' UCL claim because the otherwise certifiable portion embraces individuals who would not have standing to sue on their own. *See Bishop*, 1996 WL 33150020, at *5. With that exception, however, the Court finds that class litigation is the superior method for resolving the claims presented in this action.

### III. *RULING*

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion. Plaintiffs are **ORDERED** to file a proposed class certification order that is consonant with this Order and includes all findings required by Rules 23(a) and (b) of the Federal Rules of Civil Procedure **on or before May 19, 2014.** The proposed order should include the following classes:

1. A Class composed of all current and former non-exempt employees of ATG who work (or worked) at ATG's LAX location from May 1, 2010, until March 4, 2013, that embraces Plaintiffs' claim against Defendants for willful violations of the LWO's provisions governing wages and compensated time off, and the claim for violations of California Labor Code section 226.

2. A Subclass composed of all members of the Class whose employment with ATG terminated before March 4, 2014, and who were not paid all compensation due under the LWO at the time of

---

7. Plaintiffs' own UCL claims appear to be moot except to the extent that they request restitution for uncompensated time off denied in violation of the LWO. *See Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) ("[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cogni-

zable interest in the outcome."). Given the ongoing supervision by the OCC, it is unlikely that ATG will revert to its old wage scale and time-off policy. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (listing factors for determining when voluntary cessation renders a claim moot).

termination that embraces Plaintiffs' claim for violations of California Labor Code section 203.

IT IS SO ORDERED.